406 S.E.2d 214

**In the Matter of SCOTTIE D., Rebecca W., Patsy D., and Crystal D., Children Under the Age of Eighteen Years.**

**No. 19676.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 1991.

Decided June 14, 1991.

Peter A. Hendricks, Madison, Guardian Ad Litem for the infant children.

John R. Mitchell, Charleston, for the appellee, Ronald D.

McHUGH, Justice:

This case is before the Court upon the appeal of Peter A. Hendricks, guardian *ad litem* for Scottie D., Rebecca W., Patsy D., and Crystal D.[1] The appellee is Ronald D. In the action below, the West Virginia Department of Human Services (DHS) petitioned the Circuit Court of Boone County to terminate the parental rights of Ronald D. and his wife, Joyce D., pursuant to *W.Va.Code*, 49–6–1 [1977].[2] In that action, the appellant was appointed guardian *ad litem* for the infant children. The appellant is aggrieved by the March 17, 1989 order of the circuit court. For reasons stated in this opinion, we reverse that order.

I

On February 11, 1985, the DHS filed an action in the Circuit Court of Boone County, alleging that the children of the appellee, Ronald D. and his wife, Joyce D., were neglected and abused pursuant to *W.Va. Code*, 49–1–3 [1990].[3]

The appellee and Joyce were married on November 24, 1983. Four children are now involved in this case: Scottie D., seven and one-half years old at the time of the petition in this case, the natural son of the appellee, Ronald D., but not of Joyce D.; Rebecca W., three years old, the natural daughter of Joyce D., but not of the appellee; Patsy D., one year old, born of both the appellee and Joyce D.; and Crystal D.,

---

1. Consistent with our practice in cases involving sensitive matters, we use initials rather than full names. *See In re Jonathan P.,* 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989) (citing cases).

2. The Department of Human Services is now known as the "division of human services," and is now a part of the "department of health and human resources." *See W.Va.Code,* 5F–2–1(d)(2) [1990]; *W.Va.Code,* 5F–2–1(j) [1990]; and *W.Va.Code,* 9–2–1a [1985].

3. *W.Va.Code,* 49–1–3 was amended in 1990. The 1984 version of this provision was in effect at the time this action was commenced. However, the amendments have no bearing on the *pertinent* part of *W.Va.Code,* 49–1–3, which provides:

> (a) 'Abused child' means a child whose health or welfare is harmed or threatened by:
> (1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict, *or knowingly allows another person to inflict, physical injury, or substantial mental or emotional injury, upon the child or another child in the home* [.]

(emphasis supplied)

born in 1986 of both the appellee and Joyce D.[4]

The DHS petition sought to terminate the parental rights of the appellee and Joyce. Giving rise to this petition was an incident which occurred on February 8, 1985, wherein one of the children, namely, Rebecca, was treated in a hospital emergency room due to severe burns on her feet.[5]

Following trial of the DHS action in the Circuit Court of Boone County, the circuit court entered an order on March 17, 1989, concluding that the appellee, Ronald D., did not neglect or abuse *his* children (Scottie, Patsy and Crystal) within the meaning of *W.Va.Code*, 49-1-3 [1984]. The order also concluded, however, that Ronald D. has no parental rights to Rebecca because she had not been adopted by him.[6]

The primary issue raised by the appellant is that the circuit court committed error by returning the children to Ronald D. based upon its finding that there is no evidence of abuse on the part of Ronald D. Rather, the appellant contends that there was clear and convincing evidence that Ronald D. either: (1) took no action with respect to the abuse inflicted upon his children; or (2) actually aided or protected the abusing parent, Joyce, by supporting her version as to how the children were injured.

The medical evidence presented in this case indicated that Rebecca, when she was admitted to the emergency room on February 8, 1985, suffered from: severe submersion burns on both feet, resulting in the loss of several toes; a laceration on one foot; cigarette burns which were secondary to the submersion burns; a laceration on her lip; bruises on her back; and spots on her head where hair had evidently been pulled out. Rebecca was admitted to the hospital the following day.

Dr. Jill Bross, the chief pediatric resident in charge of the case, testified on behalf of the DHS that during physical therapy, Rebecca told her that her parents had injured her in this way.

Dr. Bross testified that, in her opinion, the burns on Rebecca's feet were submersion burns. This opinion is based upon a number of reasons: both feet had second to third degree burns; the pattern of the burns; the burns stopped at a single line of demarcation; there were no splashmarks; the burns extended down in between the toes and all the way around the feet. Dr. Bross testified that Rebecca related to her that the appellee burned her feet with a cigarette and that her mother put her feet in hot water. Rebecca also told Dr. Bross that the appellee pulled her hair out and cut her lip.

Dr. Bross also testified that, in an unofficial capacity, she examined Patsy. This examination revealed bruises in the vaginal area. Dr. Bross testified that such bruises are not of an accidental type because there were no surrounding marks in the leg area.

Scottie testified that he did not want to return to living with his father and Joyce due to the physical abuse that he endured. Scottie testified that his father and Joyce made him and Rebecca eat out of the garbage bin and that they sometimes put Rebecca to sleep on the floor. He also testified that his father and Joyce put shaving cream in Rebecca's mouth because she could not pronounce certain words correctly and also did this when she used bad words. Scottie testified that his father and Joyce taped Rebecca's hands behind her back and made her walk through the hall-

---

**4.** Upon Crystal D.'s birth, the other three children had already been removed from their home by the DHS, and, consistent with this action, she too was placed in the temporary legal custody of the DHS.

Ronald D. did not adopt as his child, Rebecca W., nor did Joyce D. adopt as her child, Scottie D.

**5.** Subsequent to the filing of the DHS petition, criminal proceedings were instituted against the appellee and Joyce D. Both were indicted by a grand jury in Boone County and charged with malicious wounding and child abuse.

Joyce D. pled guilty and was sentenced to prison for one to three years.

Ronald D. was tried on the indictment and the case was dismissed, on the prosecutor's motion, due to contradictory testimony as well as a lack of critical testimony on the part of a key witness, namely, Rebecca W.

**6.** The appellee and Joyce D. were divorced on June 1, 1988.

way under this condition, and that they burned him and Rebecca with cigarettes on numerous occasions. He further testified that his father and Joyce did not make him attend school, and that they put "Nair," a hair removal substance, on his and Rebecca's hair, making their hair fall out.

Scottie also testified that he liked the couple with whom he was currently living, and that he desired to stay with them. He also testified that he currently attends school regularly, is an honor roll student while living with this couple, and is active in extracurricular activities such as scouts and basketball, activities in which his father and Joyce would not allow him to participate.[7]

Rebecca also testified. She was five years old at the time of the hearing in this case. Her testimony was brief and some of it was contradictory. She testified that both parents burned her feet by holding them in a pan of water. However, she also testified that she could not remember who was with her at the time her feet were burned, or even if her mother came to her assistance.[8] Rebecca also testified that the appellee had burned her foot with a cigarette.

Marjorie Barker, a case worker for the DHS, was involved with this case from its very beginning. One of her responsibilities was to schedule for the children visits with the appellee and Joyce during the period the children were in the temporary legal custody of the DHS. Barker testified that she was usually present during these visits, and that it was evident that the appellee

and Joyce did not always exercise the best judgment.[9]

Barker also testified that, in her opinion, it would not be in the children's best interests to be returned to the appellee and Joyce because they would be in danger of injury. Furthermore, Barker testified that it is her opinion that there is very little bonding between the children and their parents.

Joyce D. denied all allegations of abuse and neglect, even though she acknowledged previously pleading guilty in the related criminal proceeding.

Joyce testified that on the night of February 8, 1985, Rebecca told her that she was going out on the front porch in order to urinate.[10] When Rebecca came back into the house, she told Joyce that she had stepped on an ax and cut her toes, and when Joyce was in the kitchen getting cold water to treat the cut toes, Rebecca stepped into a pan of hot water in the living room, which was to be used for mopping the floor. Joyce testified that she never saw Rebecca standing in the water. Joyce testified that she then went to get her husband, the appellee, from his parents' house next door. She called an ambulance and Rebecca was taken to the hospital.

Joyce testified that Rebecca got into the Nair hair remover herself, mistakenly believing that it was baby lotion. Joyce claimed that Rebecca rubbed the Nair in her own hair. As for Rebecca's cut lip, Joyce claimed that it opened due to being chapped.

7. Slight variations in the testimony were revealed when Scottie took the stand. During cross-examination, Scottie testified that around the time that the children were removed from the home, when he was only six years old, he was not completely truthful with the deputy sheriff who was investigating the situation. Specifically, the untruthful statements concerned: whether Rebecca slept on the floor at all times; whether Scottie liked attending school, and, hence, whether he was angry with his father for not making him attend; and whether he loved his father.

However, Scottie, who was nine years old at the time of the hearing in court, testified that when he spoke with the deputy sheriff, he was

only attempting to protect his father. When asked what he meant by protecting his father, Scottie replied: "I didn't want him to go to jail, but now I am telling the truth."

8. Rebecca was only three years old at the time her feet were burned in the water.

9. For example, Barker testified that on one occasion, the appellee told Scottie that he (the appellee) sold Scottie's dog. This upset Scottie to a point where he almost cried, until his father told him that he was only joking.

10. Joyce testified that their house did not have running water.

When asked about two small circular burns on Rebecca's foot, Joyce testified that a pair of boots had caused the markings. Joyce also testified that neither she nor her husband ever put shaving cream in Rebecca's mouth, and that she never made Rebecca sleep on the floor.

The appellee, Ronald D., testified as well. The appellee's testimony is consistent with Joyce's to the extent that it is supportive of her testimony. In addition to denying the commission of any abusive acts toward the children, the appellee essentially testified that he believed that the injuries to the children occurred in the manner as expressed to him by his wife, Joyce.

Specifically, with respect to the hot water burns on Rebecca's feet, the appellee testified that he was at his parents' house, which is about fifty to seventy-five feet from his own, when Joyce came to tell him of Rebecca's burns. The appellee alleges that his wife told him that Rebecca got into the mop water by herself and that he has never discussed it with her since that time.

The appellee testified that he once asked Joyce how Rebecca's hair came out and was told by Joyce that Rebecca got into the Nair hair remover herself. Furthermore, like Joyce, he testified that Rebecca's cut lip was the result of it being chapped.

As for the cigarette burns, the appellee testified that he had never noticed such burns on Rebecca's hands, but the burns on her feet were the result of wearing a particular pair of boots. This testimony is consistent with Joyce's version. In regard to cigarette burns on Scottie, the appellee

testified that Scottie ran into him when he had a cigarette in his hand.

The appellee also testified that Joyce told him about Rebecca cutting her foot on the ax. This occurred after Rebecca was taken to the hospital on the night of February 8, 1985.[11]

## II

This Court has recognized the fundamentally protected right of a natural parent to the custody of minor children.

> In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

■ This principle, however, is tempered, thus, such right is not absolute. "Though constitutionally protected, the right of the natural parent to the custody of minor children is not absolute and it may be limited or terminated by the State, as *parens patriae*, if the parent is proved unfit to be entrusted with child care." *Id.*, syl. pt. 5.

■ Under *W.Va.Code*, 49–6–2 [1984], the standard as to whether a child is abused or neglected is "by clear and convincing proof." Accordingly, our review of the facts before the circuit court in this case is based upon a "clear and convincing" standard.

---

11. Furthermore, the record in this case contains the findings and report of Dr. LaRee Naviaux, a licensed clinical psychologist, social worker, and counsellor.

Dr. Naviaux examined the children from August, 1989, to May, 1990. These examinations were very thorough, and included, among other things, depression tests, personality questionnaires, history and background evaluations, and intelligence tests. Based upon the evidence, Dr. Naviaux found that the behaviors of the children are consistent with neglect and abuse. Dr. Naviaux's recommendation is as follows:

There appears to be no basic relationship which could be developed into an appropriate

parent-child relationship with love and trust. Thus, it is not in the best interests of these children as individuals or as a family unit to be returned to the custody of their father. Considerable trauma would be added to the life of each child. Regression, emotional problems, and deterioration of behavior, with acting-out would likely occur. Self-esteem would diminish and a zest for life would disappear. Living would become surviving. They are already children at risk for what they have experienced thus far in their lives and with their inherited abilities and characteristics. A return to their father would increase the at risk status.

■ The appellant, as stated previously, contends that this case contains clear and convincing evidence that the appellee either: (1) took no action with respect to the abuse inflicted upon his children; or (2) actually aided or protected the abusing parent, Joyce, by supporting her version as to how the children were injured.

In *In re Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985), this Court affirmed the trial court's termination of a father's parental rights as proper, despite his contention that he was not a direct participant in the acts giving rise to the termination petition, but where he supported his wife's testimony as to physical injuries, which testimony was inconsistent with medical evidence. In *Darla B.*, we noted:

> The father asserts that he should not have his rights terminated because he was not a direct participant in the acts giving rise to the petition [for termination of parental rights]. However, in light of the circumstances of this case, termination of the rights of both parents is the proper result. We note that appellant Dwayne B. supports the testimony of his wife entirely, even though the explanation is inconsistent with the medical evidence. Further, he testified that he was in attendance when the first injury to Darla B. occurred, which involved the child's right frontal lobe. Importantly, the explanation given for this injury by both appellants is inconsistent with the medical evidence. Aside from his direct support of his wife's version of the reasons for the infant's injuries, it is ludicrous for him to assert that he should be held blameless for his nonaction in protecting his child.

175 W.Va. at 141, 331 S.E.2d at 873.

The appellee maintains that the *Darla B.* case is distinguishable because in that case, *both* parents were present at the time of one of the child's injuries and it was obvious that they were both lying to protect each other. In this case, the appellee contends that because he was not present at the time of the injury (referring to Rebecca's hot water burns), then the purpose of his testimony was not to protect his wife.

However, this distinction is inapposite and somewhat inaccurate. As we said in *Darla B.* and quoted herein, "it is ludicrous for [the nonparticipating father] to assert that he should be held blameless for his *nonaction* in protecting his child." *Darla B.*, 175 W.Va. at 141, 331 S.E.2d at 873 (emphasis supplied). Although the appellee's version does not *expressly* support his wife's account, it is nonetheless *supportive*, and, importantly, inconsistent with the medical evidence presented. This is especially apparent from the appellee's testimony that he never discussed Rebecca's burns with Joyce after Joyce explained how such burns occurred. Obviously, the appellee believed his wife's version, and, therefore, he is supportive of this version.

Furthermore, the injury to Rebecca's foot was not the only critical event in this case. On the contrary, the record is replete with instances of injuries suffered by the children, some caused not only by the appellee's inaction, but his actions as well.

As pointed out in note 3 *supra*, *W.Va. Code*, 49-1-3(a)(1) [1990] provides the definition of an "abused child":

> (a) 'Abused child' means a child whose health or welfare is harmed or threatened by:
>
> (1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict, or *knowingly allows* another person to inflict, physical injury, or substantial mental or emotional injury, upon the child *or another child in the home*[.]

(emphasis supplied)

We spoke to this statutory provision in syllabus point 3 of *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988):

> W.Va.Code, 49-1-3(a) [, as amended], in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse. Under this standard, termination of parental rights is usually upheld only where the parent takes no action in the face of knowledge of the abuse or actually aids or protects the abusing parent.

Clearly, the appellee's actions and inaction come within this standard, and the

evidence presented below was clear and convincing to support this standard.

██ Therefore, we reiterate our holding in *Darla B.*, 175 W.Va. 137, 331 S.E.2d 868 (1985). Termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49-6-1 to 49-6-10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W.Va.Code*, 49-6-1 to 49-6-10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence.

██ Based upon the experiences through which the children in this case suffered, we fail to see how the circuit court reached the conclusion that the appellee's children are not abused within the meaning of *W.Va. Code*, 49-1-3, as amended, insofar as their father is concerned.

Accordingly, we reverse the March 17, 1989 order of the Circuit Court of Boone County as it applies to the appellee in this case, Ronald D.

### III

The appellant also contends that the circuit court erroneously limited the role of the guardian *ad litem* for the children in this case.

*W.Va.Code*, 49-6-2(a) [1984] provides, in part:

(a) In any proceeding under the provisions of this article, the child, his parents, his custodian or other persons standing in loco parentis to him, such persons other than the child being hereinafter referred to as other party or parties, shall have the right to be represented by counsel at every stage of the proceedings and shall be informed by the court of their right to be so represented and that if they cannot pay for the services of counsel, that counsel will be appointed.

Rule XIII of the *West Virginia Trial Court Rules for Trial Courts of Record* provides:

In any proceeding in which a guardian ad litem is appointed, such guardian ad litem shall be selected independently of any nomination by the parties or counsel.

Any guardian ad litem shall make a full and independent investigation of the facts involved in the proceeding; and either by his testimony made of record, or by full and complete answer therein, make known to the court his recommendations, concerning the action sought in the proceedings unless otherwise ordered or instructed by the court. Such guardian ad litem shall be paid such compensation as may be allowed by the court, which compensation shall be taxed as part of the costs.

Specifically, the appellant contends that he, as the guardian *ad litem*, was denied latitude in cross-examining witnesses, presenting evidence, and arguing before the trial court.

Based upon our review of the record, we believe that the guardian *ad litem* in this case was allowed to effectively represent the children.

However, we believe it appropriate to clarify the role of the guardian *ad litem* in similar cases.

Under *W.Va.Code*, 49-6-1 [1977], the DHS is authorized to petition a circuit court for relief on behalf of children that are believed to be neglected or abused. The record in this case, as we have pointed out, overwhelmingly supports termination of parental rights. The fact that the DHS did not pursue an appeal in this case is troublesome to this Court.[12]

---

**12.** *W.Va.Code*, 49-7-22 [1936] provides: "Cases under this chapter, if tried in any inferior court, may be reviewed by writ of error or appeal to the circuit court, and if tried or reviewed in a circuit court, by writ of error or appeal to the supreme court of appeals."

Fortunately for the children, though, their guardian *ad litem did* pursue an appeal, thus, seeking review of the circuit court's erroneous order. The guardian *ad litem* is to be commended for his diligence in protecting the rights of the children in this case.

■ In a comparable context, the "guardian ad litem representing an infant plaintiff has full power to act for the purpose of securing the infant's rights, and may do all things that are necessary to this end." 42 Am.Jur.2d *Infants* § 178, at 165 (1969). Securing the infant's rights includes taking an assertive role and, if in the judgment of the guardian *ad litem*, a case so warrants, prosecuting an appeal.

■ It is well established that "[a]fter judgment adverse to his ward, the guardian ad litem has the right to appeal and the duty to do so if it reasonably appears to be to the advantage of the minor[.]" *Robinson v. Gatch*, 85 Ohio App. 484, 487, 87 N.E.2d 904, 906 (1949). This is based upon the principle that a guardian *ad litem* has a duty to represent the child(ren) to whom he or she has been appointed, as effectively as if the guardian *ad litem* were in a normal lawyer-client relationship.

Similarly, the Supreme Court of Wisconsin has held that a "guardian ad litem has the right—if not the duty—to appeal from an adverse decision of a court if he believed the appeal meritorious and necessary for the protection of the children[.]" *In re Estate of Trotalli*, 123 Wis.2d 340, 349, 366 N.W.2d 879, 883 (1985). *See also In re Ross*, 29 Ill.App.3d 157, 161–62, 329 N.E.2d 333, 336–37 (1975); *State ex rel. Kassen v. Carver*, 355 S.W.2d 324, 332–33 (Mo.Ct. App.1962); *Carton v. Borden*, 8 N.J. 352, 357, 85 A.2d 257, 259 (1951).

The *Rules of Professional Conduct* recognize the guardian *ad litem*'s duty to appeal as well. Specifically, Rule 1.14(a) provides: "When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of *minority*, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a *normal client-lawyer relationship* with the client." (emphasis supplied). Obviously, a "normal" client-lawyer relationship entails prosecuting an appeal if necessary. Furthermore, Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

■ Accordingly, we hold that in a proceeding to terminate parental rights pursuant to *W.Va.Code*, 49-6-1 to 49-6-10, as amended, a guardian *ad litem*, appointed pursuant to *W.Va.Code*, 49-6-2(a), as amended, must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children. This duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian *ad litem*, an appeal is necessary.

## IV

Based upon the foregoing, the March 17, 1989 order of the Circuit Court of Boone County is reversed.[13]

Reversed.

---

**13.** The March 17, 1989 order of the Circuit Court of Boone County is not reversed as it applies to Joyce D. Joyce D. is not an appellee herein inasmuch as no appearance was made on her behalf.

The appellant also assigns other errors, which, in light of our holding, we need not address. These other errors include: the circuit court's failure to address the question of whether the appellee, Ronald D., could benefit from counselling; and the circuit court's failure to consider the passage of four years since the children lived with the appellee.