460 S.E.2d 277

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**James A. ROY, Defendant Below, Appellant.**

**No. 22695.**

Supreme Court of Appeals of West Virginia.

Submitted May 16, 1995.

Decided June 15, 1995.

---

Joanna Bowles, Asst. Atty. Gen., Charleston, for appellee.

Dwight R. Hall, Sims & Hall, Elkins, for appellant.

CLECKLEY, Justice:

On July 13, 1994, James A. Roy, the defendant below and appellant herein, was convicted of one count of third degree sexual assault following a jury trial in the Circuit Court of Randolph County.[1] He was sentenced to serve one to five years. The defendant appeals the September 21, 1994, order of the trial court which denied his motion for

1. A third degree sexual assault, commonly known as "statutory rape," is committed when a person "sixteen years old or more, engages in . sexual intercourse or sexual intrusion with another person who is less than sixteen years old and who is at least four years younger than the defendant." W.Va.Code, 61–8B–5 (1984), in part. "Consent to the act is irrelevant." Syl. pt. 5, in part, *State v. Sayre*, 183 W.Va. 376, 395 S.E.2d 799 (1990).

a new trial. He contends the trial court erred by failing to compel the State to turn over the entire file of the victim's psychiatric records. He also cites as error the testimony of his cousin regarding the defendant's reputation for truthfulness.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In 1992, fourteen-year-old Bobbi Jo D.[2] occasionally would babysit the two children of her friend, Patricia Skidmore. The defendant was dating Ms. Skidmore at that time and would periodically stay all night at her home. The defendant and Bobbi Jo did not have frequent contact with each other, but Bobbi Jo had developed somewhat of a crush on him. She reported that at one point the defendant told her she was cute for her age and that he fondled her breasts.

In December of 1992, Bobbi Jo watched the children one evening when Ms. Skidmore and the defendant went to the China Gardens restaurant. The couple returned home at approximately midnight, and Ms. Skidmore went to bed. The defendant went to the bedroom at first but came back down to the living room to be with Bobbi Jo. She was lying on the couch watching television. He looked at her and asked her if she "wanted it or not" and she said yes. He went to check on Ms. Skidmore and the children and came back into the living room. The defendant kissed her and laid on top of her. He pulled her shorts off and had sexual intercourse with her for approximately half an hour. He drank a beer and then went back to bed.

The same series of events occurred the following weekend when Bobbi Jo babysat at Ms. Skidmore's home. Upon returning home from their date, the defendant and Ms. Skidmore went to the bedroom. The defendant later returned to the living room. Once again, he and Bobbi Jo had sexual intercourse on the couch. Afterwards, the defendant told Bobbi Jo that Ms. Skidmore did not excite him anymore, but she did. Bobbi Jo could not remember the exact dates she was with the defendant, but she believed them to be in December of 1992.

During the fall of 1992, Bobbi Jo was receiving counseling at Youth Health Service. She was having difficulty dealing with the separation of her mother and stepfather. Although Bobbi Jo did not have a substance abuse problem, she was enrolled in the Substance Abuse Prevention Program funded by a federal grant to help prevent troubled teens from abusing drugs and alcohol.[3] In December of 1992, Bobbi Jo informed Catherine MacDonnell, a social worker/counselor[4] at the center, about the defendant. At first, Ms. MacDonnell believed Bobbi Jo was simply talking about a boy her age she was interested in dating. However, when Ms. MacDonnell learned that Bobbi Jo had sexual relations with the twenty-six-year-old defendant, she became alarmed. She spoke with her supervisors, and they reported the incident to Child Protective Services. Bobbi Jo's mother was also notified.

Ms. MacDonnell testified that Bobbi Jo suffers from a mild mental handicap. Although she was in the eighth grade when these events occurred, Ms. MacDonnell stated that Bobbi Jo operated at approximately a sixth-grade level. She stated that Bobbi Jo was not known to fabricate lies or fantasize any more than a typical teenager.

---

**2.** We follow our traditional practice in cases involving children and sensitive facts and do not use the last name of the victim. *See generally, Matter of Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991); *State ex rel. Div. of Human Serv. by Mary C.M. v. Benjamin P.B.*, 183 W.Va. 220, 395 S.E.2d 220 (1990).

**3.** A counselor at Youth Health Service, Catherine MacDonnell, testified that "any teen that stepped in the door would be automatically enrolled in the Teen Prevention Program—Substance Abuse

Prevention Program because that's where our funding came from. `All teen services were under a large Federal Grant from the Center for Substance Abuse Prevention."

**4.** Ms. MacDonnell received her Masters Degree in Human Development from the University of Maryland. She is licensed to practice social work in the State of West Virginia. Ms. Mac-Donnell was Bobbi Jo's counselor and saw her on a biweekly basis for over two years.

Allen LaVoie, Ph.D., a psychologist,[5] performed a battery of assessment tests on Bobbi Jo at the time of her admission to the Youth Health Service program and his report was made available to the defendant. He described Bobbi Jo as mildly mentally retarded. She appeared to function at a higher level because her verbal abilities outweighed her overall mental abilities. His testimony only related to Bobbi Jo's performance on those tests because he did not review her entire file and had no knowledge of her sexual conduct generally or her relationship with the defendant.

The defendant testified that he had no sexual contact whatsoever with Bobbi Jo. He stated that on the evening he and Ms. Skidmore went to the China Gardens restaurant, he went straight to bed with Ms. Skidmore. He claimed to have had sexual relations with Ms. Skidmore that evening and again the next morning. He denied being at the Skidmore residence the following weekend when the second episode allegedly occurred.

Ms. Skidmore corroborated the defendant's testimony as it related to the evening they went to the China Gardens. If he did go downstairs after she went to bed, she did not notice. She could not remember going out with the defendant the following weekend. At first, Ms. Skidmore did not believe the defendant and Bobbi Jo were intimate. After talking with Bobbi Jo, however, she changed her mind and concluded Bobbi Jo was telling the truth.

After the defendant testified, the State called his cousin, State Trooper David Paul Hawkins. Trooper Hawkins stated he had known the defendant his whole life. When asked his opinion of the defendant's truthfulness, he replied: "[A]ny time he gets in trouble he will lie to get out of it." Trooper Hawkins also stated the defendant had a poor reputation for truthfulness in the community.

**5.** Dr. LaVoie received his Ph.D. in psychology from UCLA and is a licensed psychologist in the

II.

VICTIM'S COUNSELING RECORDS

The defendant's first assignment of error is that the trial court erred in failing to compel the State to submit to the defense the entire file of the victim held by Youth Health Service. We find no such error was committed. The defendant contends his rights to discovery as provided by Rule 16 of the West Virginia Rules of Criminal Procedure were violated by the trial court.

In our analysis, we perceive no clear legal right on the part of a defendant to the counseling records of a victim to a sexual assault. In fact, courts have frequently been called upon to analyze the parameters of discovery in sexual assault cases and have found no significant difference between these cases and other criminal cases. Indeed, if there is any difference, it favors the confidential rights of the victim and not the defendant. Because of its recurring nature and the importance of this issue to the administration of criminal justice, we will review the contentions of the defendant in detail.

The defendant contends he was entitled to inspect the counseling records of the victim under the mandate of Rule 16 of the West Virginia Rules of Criminal Procedure. Specifically, Rule 16(a)(1)(D) states:

"Reports of Examinations and Tests.— Upon request of the defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial."

As we discussed in *State ex rel. Rusen v. Hill,* 193 W.Va. 133, 454 S.E.2d 427 (1994), the purposes of pretrial discovery in criminal cases are: (1) to eliminate trial by

State of West Virginia.

ambush; (2) to permit the discovery of relevant and exculpatory evidence; and (3) to promote plea bargaining. In order to accomplish these purposes, the discovery rules are to be liberally construed. However, we also recognize the need for a procedure to limit discovery in certain cases. Subject to certain well-recognized exceptions, the scope of pretrial discovery in a criminal case is within the sound discretion of the trial court. *See* Syl. pt. 4, *State v. Bennett*, 176 W.Va. 1, 339 S.E.2d 213 (1985); Syl. pt. 8, *State v. Audia*, 171 W.Va. 568, 301 S.E.2d 199, *cert. denied* 464 U.S. 934, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983). Rule 16 implicitly grants a trial court broad discretion to manage the discovery process in a manner which allows full discovery while at the same time affords the parties a degree of protection from harmful side effects.

■ Using Rule 16 as our starting point, we believe the facts of this case do not sustain the defendant's position. In July of 1994, the defendant requested the documents from Youth Health Service. Youth Health Service replied that, due to the confidentiality of the records, the documents would be provided only upon court order.[6] The defendant filed a motion to compel Youth Health Service to provide the entire file. On July 11, 1994, the trial court conducted a pretrial hearing to address this issue. After hearing arguments, the trial court concluded it would review the file and determine whether any of the documents were material to the defense. When Ms. MacDonnell was called to testify at trial, it was brought to the trial court's attention that the motion to compel had not been ruled upon. The trial court stated that at the conclusion of Ms. MacDonnell's direct testimony, it would recess to review the records and then make its ruling. At that time, the defendant's motion was denied. The trial judge found:

"[A] review of those documents leads me to believe that there's nothing in there of any substance that would really be relevant to this case. I do find that the records report that the alleged victim is currently engaged in a sexual relationship with her boyfriend which has existed for about six (6) months. I further find that under the provisions of West Virginia Code 61–8B–11 that that would be inadmissible so I'm going to so rule."

Of course, the defendant takes issue with this ruling. On the other hand, the State responds that the defendant's claim for "any and all records and reports" is overly broad and outside the boundaries of Rule 16. We agree, in part, with the State.

■ Rule 16(a)(1)(D) allows discovery of all results or reports of physical or mental examinations which are material to the defense or are to be used as evidence in the prosecution's case-in-chief. We believe the State complied with Rule 16's mandate. The results of the victim's battery of tests upon entering the supportive services program were provided to the defendant as they were included within the report prepared by Dr. LaVoie. Our view and inspection of the record does not disclose any other material that would be required to be produced under Rule 16(a)(1)(D). The defendant contends he was equally entitled to the notes prepared during the counseling sessions between the victim and Ms. MacDonnell. We disagree.

■ Production of the counseling notes was not required under Rule 16(a)(1)(D) for three reasons. First, they were not "results or reports of physical or mental examinations." These were merely notes made during a counseling session precipitated by the impending divorce of the victim's mother and stepfather.[7] Second, the notes were not used

6. W.Va.Code, 27–3–1(a) (1977), provides, in part: "Communications and information obtained in the course of treatment or evaluation of any client or patient shall be deemed to be 'confidential information.'" Furthermore, W.Va.Code, 27–3–1(b)(3), states the information may be disclosed "[p]ursuant to an order of any court based upon a finding that said information is sufficiently relevant to a proceeding before the court to

outweigh the importance of maintaining the confidentiality established by this section."

7. We find it significant that the role of a licensed counselor or social worker is not to investigate crimes or the occurrence in question. Rather, the primary purpose of the counseling is to help the client or victim understand and resolve her feelings about events. As a practical matter, the counselor's notes are usually not likely to result

by the State in its case-in-chief nor were they relied upon by Dr. LaVoie or referred to by Ms. MacDonnell while testifying. Third, the counseling session notes were not material to the preparation of the defense or used by the State at trial for rebuttal purposes. The counseling sessions related to the victim's difficulty in coping with her mother and stepfather's divorce. The notes do not relate to the crime or the State's investigation.

The defendant contends that independent of Rule 16(a)(1)(D) the victim's psychological records could have been used to impeach her credibility on the basis of her mental disability. For that reason, the defendant asserts these records should have been disclosed to counsel for the defendant for *in camera* inspection under *State v. Allman*, 177 W.Va. 365, 352 S.E.2d 116 (1986). In *Allman*, pursuant to the request of the defendant, the trial court ordered a mental examination of the victim. After the examination report was received, the defendant requested an opportunity to review it. The trial court rejected the request, but instead conducted an *ex parte* examination of the report and determined that it was not discoverable. The report was made a part of the appellate record, and upon appeal this Court remanded for an *in camera* hearing. Specifically, we noted "[t]his Court has 'recognized that there may be occasions where evidence of psychiatric disability may be introduced when it affects the credibility of the material witness' testimony in a criminal case.' " 177 W.Va. at 368, 352 S.E.2d at 119, *quoting State v. Harman*, 165 W.Va. 494, 506, 270 S.E.2d 146, 154 (1980). (Footnote and citations omitted). To afford the defendant an opportunity to determine whether impeachment evidence was available, we stated:

"In this case, the defendant had no such opportunity to make a showing that the witness' disorder affected her credibility and that the psychiatrist had a sufficient opportunity to make a diagnosis, because he was not provided with a copy of the records. We therefore order that upon remand a copy of the granddaughter's psychiatric records should be provided to the defendant's counsel and an *in camera*

hearing held as to relevancy. In the hearing, the defense counsel shall designate what parts of the record he believes to be relevant. The court shall then accept arguments as to the relevancy from both sides, and a record shall be made of all proceedings. All material found to be irrelevant shall be sealed, but kept with the record." 177 W.Va. at 368–69, 352 S.E.2d at 119–20. (Footnote omitted).

■ The defendant uses the above language from *Allman* as a spring board to launch the proposition that we have created a bright line *per se* rule requiring the production of·all psychiatric records of a victim merely upon demand. Again, we disagree. When *Allman* is reviewed in its proper context, it disavows such a *per se* rule. Two points are noteworthy. First, *Allman* itself established a threshold burden that some showing must be made that the disorder "affects the credibility of the material witness[.]" 177 W.Va. at 368, 352 S.E.2d at 119. Second, and more importantly, this Court remanded the case to the trial court in *Allman* only because our appellate examination of the report indicated some "admissions by the [victim] which would partially exculpate Mr. Allman." 177 W.Va. at 367 n. 1, 352 S.E.2d at 117 n. 1. Thus, there was exculpatory evidence contained within the psychiatric records that could lower the level of the offenses charged. We, therefore, limit the holding in *Allman* to its facts. As discussed more thoroughly below, once a court has determined that a file contains exculpatory evidence, counsel for the defendant has a right to inspect and have access to that information. A trial court may not foreclose the defendant access to information that is crucial to the conduct of cross-examination.

In the case *sub judice*, our review of the disputed notes clearly establishes the sensitive nature of the communications between the victim and her counselor, which makes our interest in protecting the notes from disclosure particularly weighty. More significantly, our appellate review of the notes indicates that there is nothing contained in them that would indicate either directly or indirectly that the victim suffered from a

in the disclosure of any material useful to the

accused.

mental disorder which affected her credibility.

 We believe the trial court utilized appropriate procedures to protect all rights of the defendant. The notes of Ms. MacDonnell are protected from routine disclosure and discovery under three separate West Virginia statutes.[8] The public policy consideration which underlies the statutes preventing disclosure of confidential information held by counselors, social workers, psychologists, and/or psychiatrists is to enhance communications and effective treatment and diagnosis by protecting the patient/client from the embarrassment and humiliation that might be caused by the disclosure of information imparted during the course of consultation. The very nature of the consultation as took place in this case concerns confidential revelations about matters which the victim would normally be reluctant to discuss. Considering the existence and strength of these protections established by the Legislature, the only issue left for the trial court is whether, because of *Allman, supra,* and, more generally, Rule 16, a criminal defendant is entitled to judicial inspection of these confidentially protected communications *in camera* and thereafter to their release if the inspection indicates their relevancy.[9]

In *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), the defendant sought review of the contents of a child abuse file protected by a statutory privilege in order to determine whether there were material facts contained therein that would aid the defendant on cross-examination. The statute in *Ritchie* was similar to the West Virginia statutes and did not give absolute protection. The Supreme Court

8. In addition to W.Va.Code, 27–3–1, discussed at note 6, *supra,* there are two other statutes that we find relevant to this issue. W.Va.Code, 30–31–13 (1986) (licensed professional counselor), states:

"All information communicated to or acquired by a licensed professional counselor while engaged in the practice of counseling with a client is privileged information and may not be disclosed by the counselor except:

"(a) With the written consent of the client, or in the case of death or disability, with the written consent of a personal representative or other person authorized to sue or the beneficiary of any insurance policy on the client's life, health or physical condition;

"(b) When a communication reveals the contemplation of an act dangerous to the client or others; or

"(c) When the client, or his or her personal representative, waives the privilege by bringing charges against the licensed professional counsel."

W.Va.Code, 30–30–12 (1984) (certified social worker), states:

"(a) No person licensed under this statute or an employee of the licensee may disclose any confidential information he or she may have acquired from persons consulting him or her in his or her professional capacity except:

"(1) With the written consent of the person or persons, or in the case of death or disability, of his or her personal representative, other person authorized to sue or the beneficiary of an insurance policy on his or her life, health or physical condition;

"(2) When a communication reveals the contemplation of a crime or harmful act;

"(3) When the person waives the privilege by initiating formal charges against the certi-

fied social worker, graduate social worker or social worker;

"(4) When the person is a minor under the laws of this state and the information acquired by the certified social worker, graduate social worker or social worker indicates that the minor has been the victim or subject of a crime, and the certified social worker, graduate social worker or social worker may be required to testify fully in any examination, trial or other proceeding in which the commission of a crime is the subject of inquiry; or

"(5) Where otherwise required by law.

"(6) Nothing in this section shall be construed, however, to prohibit any board licensee from testifying in juvenile proceedings concerning matters of adoption, child abuse, child neglect or other matters pertaining to the welfare of children."

9. Although not raised by the defendant, it appears his best argument is that all statutes protecting confidential communications must at trial yield to the rights of the defendant to have access to helpful information. The withholding by the prosecution of evidence "that is both favorable to the accused and material to guilt or punishment" violates a defendant's due process rights. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40, 57 (1987). Evidence is "material to guilt or punishment" only if " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Ritchie,* 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57, *quoting U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985).

specifically declined to express an opinion on what the result would be in a case where the information sought was protected by an absolute statutory privilege. 480 U.S. at 57 n. 14, 107 S.Ct. at 1001 n. 14, 94 L.Ed.2d at 57 n. 14. Although the Supreme Court stated "the public interest in protecting this type of sensitive information is strong," it concluded the interest did not "necessarily prevent[ ] disclosure in all circumstances." 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57. Accordingly, the Supreme Court remanded for the trial court to review the privileged file to determine whether it contained evidence favorable and material to the guilt of the defendant. Obviously, the State's interest in the case *sub judice* is parallel to the interest advanced in *Ritchie*.

▋▋▋▋ Although we refuse to adopt a blanket rule denying a criminal defendant access to all information protected by statute,[10] we believe the defendant has the initial burden to demonstrate a need for an *in camera* inspection. We hold that before any *in camera* inspection of statutorily protected communications can be justified, the defendant must show both the relevancy, as stated in *Allman*, and a legitimate need for access to the communications. *See* McCormick, *Evidence* § 74.2 at 179 (3rd ed. 1984). This preliminary showing is not met by bald and unilluminating allegations that the protected communications *could* be relevant or that the very circumstances of the communications indicate they are *likely* to be relevant or material to the case. Similarly, an assertion that inspection of the communications is needed only for a possible attack on credibility is also rejected.[11] Such a broad right of discovery would substantially destroy the statutory protections. On the other hand, if the defendant can establish by credible evidence that the protected communications are likely to be useful to his defense, the judge should review the communications *in camera*.[12] In reviewing the protected communications to determine whether they should be released to the defendant, the trial judge should look for evidence such as a witness's motive to lie against the defendant and for such information that might indicate misidentification or the inability to identify or describe the assailant.

▋▋▋ In this case, unlike *Allman*, the defendant has made no specific showing that the requested records contain information

**10.** All these statutes protecting communications have exceptions, some more general than others, but the existence of these exceptions indicates a less firmly based legislative concern for the inviolability of the communications being protected. Therefore, when these statutes pose a substantial burden on the defendant's constitutional right to fair trial, they must yield. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (existence of juvenile record made confidential by statute admissible to show witness's bias); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (restrictive state rules of evidence must give way to defendant's right to fair trial).

**11.** " 'The vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim's anticipated trial testimony does not provide a sufficient basis to justify ignoring the victim's right to rely upon her statutory privilege.' " *People v. Foggy*, 121 Ill.2d 337, 349–50, 118 Ill.Dec. 18, 24, 521 N.E.2d 86, 92 (1988), *quoting People v. District Court In and For the City and County of Denver*, 719 P.2d 722, 726 (Colo.1986); *Commonwealth v. Two Juveniles*, 397 Mass. 261, 269, 491 N.E.2d 234, 239 (1986).

**12.** Unquestionably, there is a delicate balancing that must be performed in criminal cases. The Legislature was obviously aware of the precious rights of crime victims when it enacted these statutory protections. Similarly, this Court is well aware of the ordeal that many sexual assault victims are forced to undergo to bring assailants to justice. *See* Vivian Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum.L.Rev. 1 (1977). On the other hand, to deem all communications between victim and counselor protected from disclosure would impermissibly infringe upon a defendant's constitutional right to due process of law and confrontation of the witnesses against him. Therefore, it is necessary to strike a balance between the rights of the accused and the rights of the accuser. We believe that allowing *in camera* inspection by the trial court of *relevant* communications between the counselor and the victim would achieve the balance necessary to protect the interests of both parties. Also, any concerns that an *in camera* inspection by the trial court would negatively affect the therapeutic relationship between the victim and her counselor is minimized by this procedure. Only the trial court would have access to the notes or records and would disclose to the defendant, if necessary, only the facts material to the alleged incident as communicated by the victim to the counselor.

bearing on guilt or innocence, unreliability of witnesses, or exculpatory material. Furthermore, unlike *Ritchie*, both this Court and the trial court conducted inspections of the files and concluded that the information contained in the files would not have been helpful to the defendant. Therefore, we find no abuse of discretion in this case.

## III.

### TESTIMONY REGARDING THE DEFENDANT'S TRUTHFULNESS

The defendant next contends the testimony of Trooper Hawkins was unduly prejudicial and inappropriate because: (1) the defendant did not put on evidence to show his reputation for truthfulness; (2) the reputation was based in part upon the act charged; (3) Trooper Hawkins testified in uniform; and (4) he was not disclosed as a State's witness. The defendant objected to this rebuttal evidence. The trial court held that under Rule 608(a) of the West Virginia Rules of Evidence the State could question Trooper Hawkins concerning the defendant's reputation for truthfulness.

 The issue raised by the defendant cannot withstand analysis. First, a decision regarding the admission of evidence is within the broad discretion of the trial court and will be overturned only upon an abuse of that considerable discretion. *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995). Second, Rule 608(a) states, in part, that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness[.]" A fair reading of Rule 608(a) provides that a witness may be impeached by proof that the witness is untruthful. Under this rule, no distinction is made between nonparty witnesses and party witnesses. The rule applies with equal force to the

defendant in a criminal case. The form of proof may be either "reputation" or "opinion" evidence.

 As a preliminary threshold to the admissibility of evidence under Rule 608(a), the party offering the character evidence must establish a sufficient foundation. Given that the testimony was in the form of reputation and opinion evidence, the prosecution need only establish that the character witness was familiar with the defendant and acquainted with the community in which the defendant lived, worked, or socialized. Because no specific objection was made to the lack of foundation, we need not discuss this requirement further.[13] Rather, the defendant's most touted issue is whether character evidence is admissible against a defendant who does not· specifically place his character in issue by offering evidence that he is truthful. This issue is without merit.

 Unlike Rule 404(a)(1), under Rule 608, a witness's character for truthfulness is placed in issue once the witness testifies. No more is required. "The accused, by testifying, becomes subject to an attack on her credibility. In this regard, she is treated like any other witness, and therefore her credibility is placed in issue even though she should offer no direct testimony concerning her *good* reputation for truthfulness or concerning a character trait otherwise at issue." I Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–8(A)(4) at 688 (3rd ed. 1994). (Emphasis in original).

 Next, the defendant contends the character witness was not disclosed prior to trial. The State argues the testimony of Trooper Hawkins was in the nature of rebuttal testimony and its admissibility as rebuttal evidence is within the discretion of the trial court and should not be reversed because the defendant can show no unfair prejudice. *See State v. Dietz*, 182 W.Va. 544, 390 S.E.2d 15 (1990). We agree with the defendant that even rebuttal witnesses should be disclosed when the State has a reasonable anticipation

---

**13.** The defendant asks us to speculate whether the character evidence was based on information gathered by the witness as a result of the crime. A review of the transcript does not demonstrate that the factual basis for the character evidence emanated from the circumstances of the crime. We note that the witness was a relative (cousin) of the defendant and, even though the witness had limited association with the defendant, he felt he was sufficiently familiar with the defendant and his "community" to testify as to his character. We see no justification for finding the trial court abused its discretion in permitting the witness to testify.

that they will be used during trial. On the other hand, where the defendant claims unfair surprise due to late disclosure, our recent cases suggest that to preserve this issue for appellate review the complaining party at the very least must request a postponement to permit time to prepare. *See McDougal v. McCammon,* 193 W.Va. at 239–40, 455 S.E.2d at 798–99 ("in order to preserve the claim of unfair surprise for appeal, the aggrieved party must at the very least move for a continuance or recess"). In the absence of a request for a continuance, we do not consider this ground for error purposes.

The court below on the record referenced the proper analysis before overruling the defendant's objection. We find the other issues raised on this assignment are without merit. Accordingly, no abuse of discretion has been shown.

## IV.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Randolph County is affirmed.

Affirmed.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired Justice, and FOX, Judge, sitting by temporary assignment.