465 S.E.2d 163

**STATE of West Virginia ex rel. Jamal Adeen AZEEZ, Petitioner Below, Appellant,**

v.

**Michael MANGUM, Sheriff of Raleigh County, Respondent Below, Appellee.**

No. 22221.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1995.

Decided July 13, 1995.

Dissenting Opinion of Chief Justice McHugh Dec. 14, 1995.

166

Paul R. Cranston, Morgantown, for Appellant.

Kristen L. Keller, Chief Deputy Prosecuting Attorney, Beckley, for Appellee.

WORKMAN, Justice:

This case is before the Court upon the appeal of Jamal Adeen Azeez from an order of the Circuit Court of Raleigh County denying Appellant's petition for a writ of habeas corpus at the conclusion of the December 14, 1992, omnibus hearing. The Appellant's petition for habeas corpus was based upon his July 31, 1987, jury conviction for second degree sexual assault, for which he was sentenced to not less than ten years nor more than twenty years in the state penitentiary.[1]

It is helpful to first examine the facts underlying the Appellant's 1987 conviction. The Appellant worked as a lab technologist at the Appalachian Regional Hospital (hereinafter "hospital") in Beckley, West Virginia. The victim, Dara Corker, was an adult patient in the psychiatric ward of the hospital, who was diagnosed as suffering from a behavior disorder and was mentally retarded, moderately severe to severe.

Susan Phillips, a registered nurse at the hospital, testified that on February 5, 1987, while she was working on the evening shift in the psychiatric crisis unit, the night supervisor, Geneva Fox, informed her that she was looking for the Appellant.[2] Ms. Phillips testified that she knew the Appellant had been on the floor and went with Ms. Fox to look for him.

Ms. Fox then testified that she heard a noise emanating from the victim's room. When she opened the door to the victim's room, the room was dark[3] and the Appellant was leaning over the victim's bed. Further, according to Ms. Fox's testimony, "it looked like his pants were undone." Ms. Fox testified that she asked the Appellant what he was doing, to which he responded that "he was trying to get some blood...."[4] Ms. Phillips also testified that when they entered the room, the victim was yelling "[h]e stuck his wingding in me" and pleading for the nurses to not "let him hurt me again...."

---

1. On May 24, 1988, the Appellant petitioned this Court for an appeal arising out of this conviction. The Appellant raised the following assignments of error in his appeal: 1) permitting the victim's testimony without a finding of her competency to testify; 2) admitting Dr. Rasheed's deposition in the absence of a showing that she was unavailable to testify; 3) allowing the admission in evidence of the results of the vaginal swab in light of the mishandling of such evidence by the hospital; 4) denying the Defendant's motion to compel the victim to submit to a psychiatric evaluation; 5) denying the Defendant the victim's psychiatric records; and 6) allowing the jury to consider second degree sexual assault in the absence of evidence of all the elements thereof. The Appellant renewed this petition for appeal on July 26, 1988. We declined to review either petition.

2. Ms. Fox testified at trial that the reason she was looking for the Appellant was that there was a patient in the emergency room who needed blood drawn, and the nurse in the emergency room had been unable to locate the Appellant.

3. Jean Gieseking, a nurse at the hospital who helped locate the Appellant, testified that the Appellant told Ms. Fox that the reason there were no lights on in the victim's room was because the victim was afraid of the light.

4. The testimony at trial indicated that the Appellant told the nurses that he was attempting a femoral stick, which involves withdrawing blood from a patient's groin area. However, there was also testimony which indicated that hospital policy was that only doctors were permitted to do a femoral stick. The Appellant attempted to rebut this policy during his testimony by stating that not only had he never been informed of this policy, but that, while he was not a practicing physician, he had obtained a medical degree from a medical school located in the Caribbean.

Jean Gieseking was also a nurse at the hospital and was present when the Appellant was located. She testified that when the Appellant left the room, she observed that the victim's gown was pulled up to her waist, and her pajama pants were untied and slid down to about her hip line. Also, Ms. Gieseking testified that upon her further examination of the victim's groin area, "I thought I saw what looked like sperm in her [the victim's] pubic hair." Ms. Phillips, on her own initiative, performed a vaginal swab and turned it over to Ms. Fox.[5]

The victim also testified at trial. Even though it was undisputed that the victim was mentally retarded and suffered from a behavior disorder, the Appellant never renewed his pretrial objection to the victim's competency to testify at trial.[6] During a very succinct direct examination by the State, the victim testified that while she was a patient in the hospital, a man had come into her room and "stuck his wingding in me." The victim was unable to identify the man who had done this, and stated only that he had "stuck needles in me[,]" prior to the assault and had "dared" her to scream. The Appellant conducted a lengthy cross-examination of the victim which established that the victim thought a soap opera star named "Bobbie" had fathered her child. Also, according to the victim, "Bobbie" had been in her room on the same night that the Appellant allegedly sexually assaulted her. Further, the victim testified that she had never seen the Appellant before, and she did not know his name. Finally, the victim testified that she had had hallucinations in that she kept hearing power saws and a "choo-choo train."

Other evidence introduced by the State included the evidentiary deposition of Dr. Zarina Rasheed, the chief pathologist at the hospital who analyzed the vaginal swab specimen taken by Ms. Phillips shortly after the incident.[7] Dr. Rasheed conducted his analysis of the swab on the morning after the specimen was taken by Ms. Phillips. Dr. Rasheed testified that sperm cells were found on slides prepared from the vaginal swab; however, the doctor could not testify, based on the tests conducted, when exactly intercourse occurred with the victim, or that the sperm came from the Appellant.[8] Additionally, the victim had been examined by Dr. Slack in the emergency room of the hospital on the morning after the alleged sexual assault occurred. Dr. Slack used a Market Malicious Assault Kit (hereinafter "kit")[9] in conducting his examination of the victim. That kit was turned over to Detective Cedric R. Robertson of the City of Beckley Police Department, who in turn sent the kit to the Criminal Identification Bureau (hereinafter "C.I.B.") lab in Charleston, West Virginia, for analysis. The State entered into a stipulation with the Appellant that the laboratory analysis conducted on evidence obtained from the kit were negative.[10] That stipulation was

---

5. Ms. Fox then gave the swab to Betty Campbell, who was the night supervisor who relieved Ms. Fox. Ms. Campbell testified that she gave the swab to Frank Bosia, a medical technologist, who took the swab to the hospital's laboratory and placed it in a refrigerator until tests could be performed on it later that morning.

6. The Appellant's trial counsel made a pretrial motion to require the victim to undergo a psychiatric evaluation prior to trial due to the alleged incompetency of the victim. A copy of that motion was not made part of the record on appeal.

7. The Appellant objected to the admissibility of the deposition, arguing that the doctor, who was on vacation, was not unavailable to testify within the meaning of the West Virginia Rules of Evidence. *See* W.Va.R.Evid. 804(a). The trial court overruled this objection.

8. Dr. Rasheed testified that he could not identify whether the sperm came from the Appellant,

presumably because no samples were taken from the Appellant for purposes of comparison, although the record is silent on this issue.

9. Once again, the record is extremely unclear as to the nature of this "kit" or the type of tests or analysis it included.

10. The Appellant, after the stipulation was read to the jury, objected that the State had withheld the exculpatory evidence of the negative C.I.B. report and, therefore, had not complied with the Appellant's discovery request for exculpatory evidence. Further, the Appellant's trial counsel also indicated that it was his belief that Dr. Slack was going to testify, and that the Appellant had not received a copy of Dr. Slack's report. Mr. Lazenby, the assistant prosecuting attorney, responded to this allegation by stating that he did not believe that a C.I.B. report had been prepared, since the chemist who conducted the testing had quit his job. Mr. Lazenby also stated

read to the jury.[11] Strangely enough, there is no indication in the record that either the State or the defense apparently ever sought a blood sample from the Appellant in order to do a comparison.

The Appellant testified that he was in the victim's room to take blood from her arm, but that when she resisted, he sought to take a sample from her groin area. Additionally, the Appellant testified he was seeking to take the sample in the dark because the light bothered the victim. He also stated that his buttocks seemed to be out when nurses entered the victim's room because his pants were too large.

After deliberating, the jury found the Appellant guilty of second degree sexual assault. Following this Court's refusal to review the Appellant's two petitions for appeal arising out of his conviction, the Appellant filed a petition for a writ of habeas corpus and an omnibus hearing on that petition was conducted, before the petition was denied. The present appeal is predicated upon the following alleged errors committed by the habeas corpus court: 1) the court erred in finding that the Appellant was not deprived of a fair criminal trial as guaranteed under Article III, Section 10 of the West Virginia Constitution where the criminal trial court permitted an incompetent witness to testify against him at trial; 2) the court erred in finding that the Appellant was not denied a fair criminal trial as guaranteed by the state and federal constitutions where the criminal trial court failed to order a mental examination of the alleged victim and the prosecuting attorney failed to make a good faith effort to obtain and produce the complete medical and mental health records of the alleged victim; 3) the court erred in finding that the Appellant's rights under the Equal Protection Clause of the Fourteenth Amendment were

not violated where the trial court permitted the prosecuting attorney to exercise a peremptory challenge to remove a black juror from the jury venire without establishing any legitimate non-discriminatory reason; 4) the court erred in finding that the Appellant's rights under the Equal Protection Clause of the Fourteenth Amendment were not violated by the prosecution's peremptory challenge of a black juror because he was not a member of the "black" or "Negro" race; 5) the court erred in failing to find that the Appellant's rights under the Fourteenth Amendment were violated by the prosecution's suppression of and/or failure to reveal an exculpatory physical examination of the alleged victim, which indicated that she had not been raped; 6) the court erred in finding that the Appellant's rights under the Confrontation Clause of the Sixth Amendment were not violated by the admission of Dr. Rasheed's deposition testimony, absent a showing that she was unavailable as a witness or that the prosecution made a good faith effort to obtain her presence at trial.

### PEREMPTORY CHALLENGE

First, we address whether the Appellant's rights under the Equal Protection Clause of the Fourteenth Amendment were violated when the prosecuting attorney used a peremptory challenge to remove a black juror from the jury panel. The Appellant maintains that the trial court permitted the State to remove the juror without establishing any legitimate non-discriminatory reason and that the trial court erroneously concluded that the Appellant's rights were not violated because the juror and the Appellant were not members of the same race.[12] In contrast, the Appellee argues that the Appellant's constitutional rights were not violated in the

that "I do not believe there is a report from Dr. Slack, and if there is, I don't recall it being exculpatory." Dr. Slack did not testify at trial.

**11.** The stipulation was as follows: "THE COURT: Does the jury understand that the parties have stipulated that this evidence that was sent to the Criminal Investigation Bureau lab and the result of the test performed was negative? Both parties stipulate that as a fact." The record is unclear as to what testing occurred and what the negative result meant. Presumably, the

negative result indicated that there was no sperm or seminal fluid present on the slides taken from the victim's vaginal swab on the morning following the alleged assault.

**12.** Interestingly, the record indicates that the State left another black juror on the panel. However, that juror was struck from the panel by a peremptory challenge exercised by the Appellant.

jury selection because: 1) the Appellant is not black; 2) the Appellant and the State struck one black person each; 3) the United States Supreme Court decision in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which indicates that a defendant may object to race-based exclusions of jurors effected through peremptory strikes whether or not the defendant and excluded jurors share the same race, was not decided until four years after the Appellant's trial and is not retroactive; and 4) the prosecution gave a reasonable racially neutral explanation for its strike, which the trial court found credible.

According to the trial transcript, during voir dire, prospective juror J. Johnson, in response to questioning by defense counsel, stated that he knew Detective Cedric Robertson, who was the chief investigating officer in the case. At the conclusion of striking the jury, the Appellant's counsel stated the following objection: "we ... object to the State's striking Mr. [Johnson] ... based upon what we believe that he is black. We don't have any South Americans to pick from but we think that because Mr. Azeez is a minority[13] that the same principle applies...." The State responded to the Appellant's objection by stating that "[t]he State made the strike ... on the basis that he [Mr. Johnson] said he knew Cedric [the investigating officer]." We speculated that maybe Cedric had arrested him, we don't know. The State further stated that "I [the prosecutor] wasn't even aware the guy [the Appellant] was black." The trial court concluded that the State had offered a legitimate racially neutral reason for the strike.[14]

At the habeas corpus proceeding, the Appellant testified that while he is "not white," he would say that he is "Indian." Based on this testimony, as well as the court's observation of the Appellant, the habeas corpus court concluded that "the Defendant/Petitioner has not shown that he is a member of the black race, which is [a] requirement under the *Batson [v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)] case...." Further, the habeas corpus court concluded that even under a *Batson* analysis, the State had offered a legitimate racially neutral reason for exercising the peremptory strike.

In *State v. Marrs,* 180 W.Va. 693, 379 S.E.2d 497 (1989), we examined whether a prosecutor's use of a peremptory challenge against the only remaining prospective black juror violated the appellant's equal protection rights. We concluded that " '[i]t is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. *Constitution* for a member of a cognizable racial group to be tried on criminal charges by a jury from which members of his race have been purposely excluded.' " 180 W.Va. at 693, 379 S.E.2d at 497, Syl. Pt. 1.

We also adopted the standard established by the United States Supreme Court in *Batson* for proving a violation of equal protection in the use of a peremptory challenge:

> To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, 'the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' [Citations omitted.]

**13.** The Appellant essentially was contending that he should be considered as a member of the same race as the stricken juror because both were minorities.

**14.** The trial court stated: "You would have legitimate reason as a prosecutor if you thought that there was some animosity between the investigating office[r] and a prospective juror. I do know that may not be the greatest reason in the world, but it is a reason."

Syl. Pt. 2, *Marrs*, 180 W.Va. at 693–94, 379 S.E.2d at 497–98 (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23). Once a prima facie case is established by a defendant, "[t]he State may defeat a defendant's prima facie case of a violation of equal protection due to racial discrimination in selection of a jury by providing non-racial, credible reasons for using its peremptory challenges to strike members of the defendant's race from the jury." Syl. Pt. 3, *Marrs*, 180 W.Va. at 694, 379 S.E.2d at 498.[15]

More recently, in *Powers*, the Supreme Court addressed the issue of whether a defendant has standing to raise the equal protection rights of a juror excluded from service because of race in violation of the juror's equal protection rights. The Supreme Court concluded that "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service." 499 U.S. at 415, 111 S.Ct. at 1373. Consequently, the Supreme Court held that "a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race." *Id.*

■ We discussed the implications of the *Powers* decision in *State v. Harris*, 189 W.Va. 423, 432 S.E.2d 93 (1993), when we stated that "[s]ince *Batson*, the U.S. Supreme Court

has expanded the scope of *Batson* to require an inquiry whenever there might be discrimination in juror selection irrespective of the race of the defendant." *Id.* at 427, 432 S.E.2d at 97. Due to this expansion, we stated that "to establish [a] *Batson prima facie* case the defendant need only object to the strikes on the grounds that the prosecutor has a discriminatory motive. At that point, the court must ask the prosecutor to state on the record a legitimate non-discriminatory reason for the strike." *Id.*

■ The Appellant argues that the prosecution's peremptory challenge of the black juror was violative of the Appellant's equal protection rights irrespective of the Appellant's race based upon the United States Supreme Court decision in *Powers*. *See* 499 U.S. at 409, 111 S.Ct. at 1369–70. The Appellant maintains that since *Powers* did not establish a new rule,[16] but rather was an extension of precedent, then the defendant in a collateral attack may benefit from the decision even though it was decided after the defendant's conviction became final.[17] The Appellee, however, maintains that the *Powers* decision should not be applied retroactively to the present case.

The Appellant's contention that the *Powers* decision is retroactive is unpersuasive and unsupported by case law.[18] It is clear that

---

**15.** We recently held in *State v. Kirkland*, 191 W.Va. 586, 447 S.E.2d 278 (1994), that:

> A trial court should conduct an evidentiary hearing if, after considering the prosecutor's representations regarding the reasons for using a peremptory strike to exclude the only remaining black juror, the court deems that the circumstances surrounding the prosecutor's representations warrant such a hearing to determine whether the explanations offered by the prosecutor in exercising said strike were racially neutral or discriminatory in nature. The determination on whether to conduct an evidentiary hearing is within the sound discretion of the trial court.

*Id.* at 588–89, 447 S.E.2d at 280–81, Syl.Pt. 9.

**16.** "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989).

**17.** The Appellant relies on *Teague* as support for his proposition. In that case, the Supreme Court held that generally "new constitutional rules of

criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310, 109 S.Ct. at 1075. A case is final if it is not "currently in litigation or on appeal where the error has been properly preserved at trial." *State v. Kopa*, 173 W.Va. 43, 53, 311 S.E.2d 412, 422 and Syl.Pt. 2 (1983).

Ironically, the Supreme Court further stated that "[i]n *Allen v. Hardy* [478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986)], the Court held that *Batson* constituted an 'explicit and substantial break with prior precedent' ... [and] concluded that the rule announced in *Batson* should not be applied retroactively on collateral review of convictions that became final before *Batson* was announced." 489 U.S. at 295, 109 S.Ct. at 1067 (quoting *Allen*, 478 U.S. at 258, 106 S.Ct. at 2879–80).

**18.** Unless *Powers* can be held retroactive, it would be impossible for the Appellant to prevail on this issue under *Batson* and our consequent *Marrs* case, for those cases both required that

*Powers* was not the law when the Appellant's conviction became final, because the Supreme Court in *Powers* pronounced a new constitutional rule. An examination of decisions of federal circuit courts of appeals which have found that the *Powers* decision constituted a new constitutional rule and, therefore, was not entitled to retroactive application, makes this powerfully evident.

For instance, the Seventh Circuit Court of Appeals in *Holland v. McGinnis*, 963 F.2d 1044 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993), recognized that *"Powers* is a new rule.... [T]herefore [the petitioner is] not entitled to its retroactive application on collateral review." 963 F.2d at 1057. In reaching this decision, the *Holland* court stated that

> [t]o have 'compelled' *Powers* within the meaning of *Teague*, the rule established in *Batson* would have had to be more specific (e.g. 'defendants may challenge the state's racially discriminatory use of peremptory challenges whether or not they are of the same race as the excluded jurors'). Or the defendant in *Batson* would have had to have been of a different race than the excluded jurors. (Either possibility would have rendered *Powers* superfluous.) In sum, *Batson*, ... had a latent ambiguity; it did not specifically permit cross-racial attacks on the state's peremptory challenges....
>
> ... *Batson* did not dictate the result in *Powers*.

*Id.* at 1054–55. Further, the Sixth Circuit Court of Appeals in *Echlin v. LeCureux*, 995 F.2d 1344 (6th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 552, 126 L.Ed.2d 453 (1993), stated that "only after *Powers* was it clear that a white defendant possesses an equal protection right to challenge a prosecutor's racially discriminatory strikes. *Adding this newly announced right to Batson's emphasis on a defendant's right to prevent exclusion of*

*jurors of the defendant's own race leads to this conclusion."* 995 F.2d at 1350 (emphasis added). Thus, the *Echlin* court held that *"Powers* announced a new rule insofar as it extended *Batson* to cover challenges by a white defendant to the prosecutor's exclusion of black jurors." *Id.* Finally, the Eleventh Circuit stated in *Farrell v. Davis*, 3 F.3d 370 (11th Cir.1993) that:

> The language of *Batson* clearly limited its application to defendants of the same race as the excluded jurors. The Supreme Court's holding in *Powers* that a defendant has standing to object to race-based exclusion of jurors, whether or not the defendant and excluded jurors share the same race, is *a complete departure from the established precedent regarding standing and equal protection.*

*Id.* at 372 (emphasis added).

Accordingly, we hold that pursuant to the Supreme Court's decision in *Powers*, a defendant in a criminal trial can assert a prima facie case of racial discrimination in the use of a peremptory challenge without having to be a member of the same racial group as the prospective juror who was the subject of the state's peremptory challenge.[19] *See* 499 U.S. at 415, 111 S.Ct. at 1373. However, *Powers* established a new rule which precludes any retroactive application on collateral review to convictions that became final before *Powers* was announced.

Thus, since the *Powers* decision is not applicable to the present case, the Appellant had to establish a prima facie case of racial discrimination pursuant to the law enunciated in *Batson* and *Marrs*, by demonstrating that he was a member of a cognizable racial group, and by showing that the state had exercised a peremptory challenge to remove from the jury panel a member of the defendant's race. *See* Syl. Pt. 2, *Marrs*, 180 W.Va. at 693–94, 379 S.E.2d at 497–98. The Appellant, by virtue of being Indian, was a mem-

---

" 'the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members *of the defendant's race.*' " Syl.Pt. 2, *Marrs*, 180 W.Va. at 693–94, 379 S.E.2d at 497–98 (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23) (emphasis added).

**19.** We recognize that even under *Powers*, the state's enunciation of a non-discriminatory reason for exercising the peremptory challenge may defeat a defendant's prima facie case of an equal protection violation due to racial discrimination in selecting a jury.

ber of cognizable racial group. The juror removed by the State's peremptory challenge was not Indian, however, but rather was African–American, and therefore not a member of the Appellant's racial group. *See id.*

▉▉▉ Furthermore, even assuming that the Appellant and the prospective jurors were members of the same racial group, the lower court was not erroneous in its determination that the prosecutor offered to the trial court a credible, racially neutral reason for using a peremptory challenge to strike Mr. Johnson, since the reason offered by the State (that the prospective juror admittedly knew the chief investigating officer) is in no way related to the juror's race. The record clearly indicates that after the State offered its reason for striking the prospective juror, the Appellant did not advance any other evidence before the trial court that the prosecutor was motivated by racial discrimination in striking the juror, other than objecting to the fact that the prosecutor "speculate[d]" that the reason that the prospective juror said he knew the chief investigating officer was that the officer may have arrested the juror. As we noted in *State v. Kirkland,* 191 W.Va. 586, 447 S.E.2d 278 (1994), the findings of trial court on the issue of whether purposeful discrimination was established should be afforded great weight. *Id.* at 596, 447 S.E.2d at 288. Relying on the Supreme Court's decision in *Batson,* we stated that

'the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. . . .

Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . the finding will "largely turn on evaluation of credibility."'

*Id.* at 596, 447 S.E.2d at 288 (quoting *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 1868–69, 114 L.Ed.2d 395 (1991) and *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21).

## INEFFECTIVE ASSISTANCE OF COUNSEL

▉▉▉ The next issue is whether the Appellant was denied effective assistance of counsel. We recently established the following new standards for reviewing an ineffective assistance of counsel claim in syllabus points five and six *State v. Miller,* 194 W.Va. 3, 459 S.E.2d at 117 (1995):

In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

194 W.Va. at 6–7, 459 S.E.2d at 117–18.

Keeping these principles in mind, we now separately examine each of the Appellant's claims.

### A.

▉▉▉ First, the Appellant asserts he was deprived of effective assistance of counsel based upon the defense counsel's failure to object or otherwise raise the competence status of the victim. The Appellant argues that this resulted in the trial court allowing an incompetent witness to take the stand and introduce by way of her "mere appearance and testimony highly prejudicial evidence." Further, the Appellant alleges that his trial counsel's failure to object precluded a ruling by the trial court on the record for appellate purposes.

In contrast, the Appellee argues that a review of the trial transcript reveals that the victim's testimony benefited the defense at

trial, thereby confirming the Appellant's trial counsel's testimony at the habeas corpus proceeding that allowing the jury to see the victim in person in order to assess the victim's credibility was a tactical course that a reasonably competent counsel would have taken.

Mr. Michael Froble, the Appellant's trial counsel, testified at the habeas proceeding that the reason he did not challenge the victim's competency, even though he felt he had enough information and evidence to do so was because

> we had to make a tactical decision, and I had talked to my client [the Appellant] on numerous occasions to make sure he understood this, is if we were successful, and we were to challenge the competency, that we would end up having a trial without the testimony of . . . [the victim]. . . .

And I made a decision that in order to properly allow the jury to understand the case, that it was essential that we have the victim called and, if indeed she was not called, we were contemplating calling her as a witness ourselves. So, that was one of the reasons that we—or I backed off that.

I met with Mr. Azeez to make sure that he understood that, because when he found out . . . that I was, basically, not challenging the competency as vigorously as he wanted me to, we had an extensive meeting regarding that, and I told him why I wasn't doing it, and the delusions, the fact that the victim told him that based upon the psychiatric information I had, was basically unable to tell the difference between a soap opera and television and reality was crucial. And that if we did not have her up, either as a State's witness, or have her testify, that our case was substantially harmed, and that was the whole reason behind all that.

From a review of the victim's testimony, it becomes readily apparent that the defense attorney's strategical decision certainly comported with the standards set forth above for competence. *See* Syl. Pts. 5 and 6, *Miller*, 194 W.Va. at 6–7, 459 S.E.2d at 117–18. The victim's testimony was arguably more beneficial to the Appellant than it was to the State. This is exemplified by the fact that she could not identify the Appellant as her attacker, admitted to having hallucinations and testified that she had had intimate relations with a soap opera character. Accordingly, the Appellant's trial counsel's decision not to challenge the victim's competency in order to ensure her testimony at trial arose from a decision involving strategy, and we can not conclude that this course of action was one in which no other reasonably qualified defense attorney would have taken. *See id.*

### B.

 The Appellant next asserts that his trial counsel was ineffective by entering into the stipulation with the State concerning the negative C.I.B. lab results.[20] In contrast, the Appellee contends that the Appellant failed to demonstrate constitutional error where a stipulation favorable to the Appellant was read to the jury, and where the record confirms that the testimony of the physician who was not called at trial, but of whom the Appellant was aware, could not have benefited the Appellant.[21]

At the habeas corpus proceeding, Mr. Froble testified that entered into the stipulation because it was his experience that even when C.I.B. results were favorable to the defendant, he had never found the testimony of a C.I.B. witness helpful to the defendant. Further, Mr. Froble testified that in the Appellant's trial, the State was prepared to call a witness from the C.I.B., had he not entered into the stipulation. Finally, Mr. Froble testified that he conferred with the

---

20. These results were based upon specimens collected pursuant to an examination performed on the victim by Dr. Slack the morning after the alleged sexual assault.

21. For instance, Dr. Slack had the very real potential of adversely impacting on the Appellant's case in that the doctor may have been permitted to testify as to statements the victim made to him regarding the assault. Further, based on Dr. Slack's testimony at the habeas corpus proceeding, the doctor could have testified at the Appellant's trial that his examination of the victim did reveal "[m]ucous-like secretions present in the vagina[,]" of the victim, which his testimony indicated was possibly seminal fluid.

Appellant about his decision and that the Appellant ultimately agreed with him.

Again, even though trial counsel engaged in an arguable course of action by entering into the stipulation rather than calling a C.I.B. witness to testify about the lab results, we cannot conclude that entering into a stipulation favorable to the Appellant is a strategy which no other reasonably qualified defense attorney would have taken when considered in light of the stipulation being limited to exculpatory evidence. *See id.* Accordingly, we find no ineffective assistance of counsel with regard to the stipulation.

### C.

■■■ The last claim of ineffective assistance of counsel involves the Appellant's trial counsel's failure to call Dr. Slack, who the Appellant maintains was known to have exculpatory evidence. Dr. Slack testified at the habeas corpus proceeding that although he had no independent recollection of the examination he performed on the victim the morning after the alleged sexual assault, his notes of that examination indicated that he found "[n]o sign[s] [of] trauma, bruise[s] or laceration. Pelvic/rectal examination done and not remarkable." However, the doctor also testified that the absence of objective findings regarding sexual assault was not indicative of whether the victim had been sexually assaulted by legal definition. Also, "[his] . . . examination wouldn't permit . . . [him] to make th[e] decision[ ]" of whether the victim had been sexually penetrated by a man, and whether ejaculation had occurred. Additionally, Dr. Slack testified that he did indicate in his notes that he found the presence of "[m]ucous-like secretion present in the vagina. Dry, caked secretions present right side of vaginal outlet." However, Dr. Slack indicated that "without performing or having lab

results," there was "[n]o way of knowing[ ]" whether the mucous was from the victim or a secretion from a male and that it was "possible" that it could have been seminal fluid.[22]

Mr. Froble testified at the habeas corpus proceeding that he knew about Dr. Slack's findings regarding his examination of the victim prior to trial.[23] Mr. Froble testified that he also knew that the doctor had no independent recollection of that examination. The reasons Mr. Froble gave for not calling Dr. Slack were:

> He [Dr. Slack] possibly could have given the information that there was semen found, or a substance that could have been semen. He possibly could have testified that his recollection of the victim's mental state at the time was consistent with her being attacked. He also, as a medical doctor, could have supported and fortified the fact that there was an examination; that she had been sexually assaulted. The records also indicated a reference to sexual assault. It also indicated that there were various hospital employees that had told Dr. Slack that there had been a sexual assault; therefore, our fear was that if we called him as a witness, that basically all we were doing was fortifying the State's position, and [I] thought that was a bad strategy and bad tactics.

Further, Mr. Froble testified that he based his decision not to call Dr. Slack to testify because "we were positive as to what he [Dr. Slack] did in the examination, and we were also positive that . . . he could not help Mr. Azeez at all."

When reviewing the Appellant's trial counsel's representation in light of the *Miller* standards, it is clear that the decision not to call Dr. Slack was one which the trial counsel

---

22. The testing to determine whether seminal fluid was present was conducted at the C.I.B. lab and said testing resulted in the stipulation regarding the negative results which was read to the jury.

23. A review of the trial transcript indicates that Mr. Froble stated to the trial court that the State never produced a copy of Dr. Slack's report or the related C.I.B. report prior to trial, but he believed both might have been exculpatory. At the habeas corpus proceeding, it became clear

that Dr. Slack never prepared a report and that his notes were interspersed with nurses' notes in the emergency room record. While at first glance, Mr. Froble's testimony at the habeas corpus proceeding seems to contradict his statements made to the trial court, Mr. Froble's testimony at the habeas corpus proceeding clarified that he knew, prior to trial, what Dr. Slack's conclusions were, as well as the results of the C.I.B. report.

did not enter into hastily, but only after carefully considering the repercussions of that testimony and discussing his concerns with his client. In comparing the Appellant's trial counsel to other reasonably qualified defense attorneys, we conclude that the "identified acts or omissions were [not] outside the broad range of professionally competent assistance." Syl.Pt. 6, *Miller*, 194 W.Va. at 6–7, 459 S.E.2d at 117–18. Even if we concluded that it was error for the trial counsel not to call Dr. Slack to testify, that error would not have changed the result of the proceedings. *See id.* at Syl.Pt. 5. We reach this conclusion by reviewing Dr. Slack's testimony at the habeas corpus proceeding. It is obvious that the testimony was not as "exculpatory" as the Appellant would have this Court believe. In reality, the testimony was only slightly beneficial to the Appellant and, therefore, in light of the other evidence against the Appellant, the testimony would not have changed the outcome of the trial. Finally, the trial counsel's decision was a trial strategy and we can not conclude that no reasonably qualified defense attorney would have so acted. *Id.* at Syl.Pt. 6.

### CONFRONTATION CLAUSE

The next issue is whether the Appellant's rights under the Confrontation Clause of the Sixth Amendment were violated by the admission of the deposition testimony of Dr. Rasheed, the pathologist who confirmed that sperm were present on the vaginal swab taken by the nurse shortly after the alleged sexual assault occurred. The Appellant maintains that the State did not produce any evidence which indicated that the doctor was unavailable as a witness pursuant to West Virginia Rule of Evidence 804(a) or that the State made a good faith effort to obtain her presence at trial. *See* Syl.Pt. 3, *State v. Phillips*, 187 W.Va. 205, 417 S.E.2d 124 (1992) (discussing burden of proving unavail-

ability). The Appellee argues that the Appellant's confrontation rights were not violated when his "tactical decision" to delay trial until a time he was aware the witness would be out of the state. Moreover, the Appellee asserts that the witness' deposition contained the Appellant's successful cross-examination of the witness.

It is helpful first to examine the context in which Dr. Rasheed's deposition was entered into evidence at trial. The record indicates that Dr. Rasheed was prepared to testify at the trial on the date that the trial was originally scheduled. The Appellant moved to reset the trial date, and the court granted that motion. The State was then informed that Dr. Rasheed would not be available to testify on the new trial date.[24] The State moved the court to order that Dr. Rasheed's evidentiary deposition be taken, and the court granted the State's motion. It is undisputed that the Appellant and his attorney were present during that deposition and cross-examined the witness. At trial, the Appellant objected to the introduction of the deposition, arguing that a witness being on vacation did not satisfy the unavailability requirement of West Virginia Rule of Evidence 804(a). The trial court overruled the Appellant's objection and permitted the introduction of the deposition.[25]

In syllabus point two of *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), we held that "[t]he two central requirements for admission of extrajudicial testimony under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution are: (1) demonstrating the unavailability of the witness to testify; and (2) proving the reliability of the witness's out-of-court statement." *Id.* at 410, 400 S.E.2d at 845. Moreover, "[i]n order to satisfy its burden of showing that the witness is unavailable, that State must prove that it has made a good-faith effort to obtain the witness's attendance at trial. This showing

---

24. The record indicated that Dr. Rasheed was scheduled to be out of state on vacation at that time.

25. Dr. Rasheed's testimony was introduced by the State to establish the presence of sperm in the victim's vagina. However, the doctor could not testify that the sperm came from the Appellant, since he apparently had no samples of the defendant for purposes of comparison, but rather could only state that it could have come from any male that "happened to be in the hospital at that time."

necessarily requires substantial diligence."
*Id.*

■ Under the criteria enunciated in *James Edward S.*, it is clear that the State was acting in good faith when it informed the court in advance of trial that because of the delay in the trial requested by the Appellant, Dr. Rasheed was going to be unavailable to testify during the course of trial. Further, we are hardpressed to find unreliable a deposition which was taken with the Appellant's full knowledge that Dr. Rasheed would not be available at trial. The Appellant was given a full opportunity to cross-examine Dr. Rasheed and even the Appellant's trial counsel acknowledged during the habeas corpus proceeding that he felt that his cross-examination of the doctor during the deposition had been successful. Accordingly, the habeas corpus court did not err in determining that the admission of Dr. Rasheed's deposition at trial did not violate the Appellant's right to confrontation.

26. *See* W.Va. Const. art. 3, § 10.

27. The Appellant also alleges under this assignment of error that the prosecuting attorney failed to make a good faith effort to obtain and produce the complete medical and mental health records of the alleged victim, despite the trial court's discovery order that the prosecution was to disclose medical and mental health records to the Appellant. We recently held in syllabus point one of *State v. Roy*, 194 W.Va. 276, 460 S.E.2d 277 (1995) that "Rule 16(a)(1)(D) of the West Virginia Rules of Criminal Procedure allows discovery of all results or reports of physical or mental examinations which are material to the defense...." The Appellant, however, bases this argument upon the premise that since the victim testified at trial that she had been previously raped while hospitalized in Spencer, West Virginia, the State had an obligation to obtain those records, if they existed and to provide same to the Appellant. As the Appellee correctly asserts, the Appellant failed to demonstrate that the alleged absence of unspecified prior psychiatric or medical records were either material or denied the Appellant a fair trial. Further, the record indicates that the Appellee gave the Appellant all the victim's records it had in its possession. Therefore, we dismiss this argument as being without merit.

28. Arguably the trial court's decision not to require a psychiatric evaluation was based on the fact that the trial court had records indicating that at the time the victim was admitted to psychiatric unit three days prior to the attack, she

## DENIAL OF FAIR TRIAL

The final issue is whether the habeas corpus court erred in finding that the Appellant was not deprived of a fair trial [26] where the trial court permitted an allegedly incompetent witness to testify against him, and where the trial court failed to order a mental examination of the alleged victim.[27] The record indicates that the Appellant's trial counsel made a pretrial motion to require the victim to undergo a psychiatric evaluation prior to trial due the alleged incompetency of the victim. Apparently, an unrecorded hearing on this motion occurred and resulted in the trial court's denial of that motion, since the Appellant did not undergo a psychiatric evaluation [28] and was permitted to testify by the trial court.[29]

■ We have previously held that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl.Pt. 4, *State ex rel.*

was diagnosed as suffering from "Behavior disorder with paranoid ideations in a mental retard...."

29. It is significant to note that for reasons stated in the ineffective assistance of counsel section of this opinion *supra*, the Appellant's trial counsel did not object to the victim's competency to testify when she was called as a witness at trial. While it is clear that questions of competency are determined by the trial court, and that the trial court has a duty to "carefully question and examine the witness" once competency is raised, it is clear that the issue was not raised during trial. *State v. Butcher*, 165 W.Va. 522, 526, 270 S.E.2d 156, 159 (1980); *see State v. Wilson*, 157 W.Va. 1036, 1047, 207 S.E.2d 174, 181–182 (1974). Additionally,

> every witness is presumed to be competent, and neither feeblemindedness nor insanity renders a witness incompetent or disqualified. The only grounds for disqualifying a party as a witness are that the witness does not have knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully.

*State v. Merritt*, 183 W.Va. 601, 608, 396 S.E.2d 871, 878 (1990) (quoting F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 2.2(B) (2d ed.1986)) (citing *United States v. Odom*, 736 F.2d 104 (4th Cir.1984)). In the present case, the victim had knowledge of the sexual assault and had the capacity to recall the incident.

*McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983). Pursuant to our holding in *Mohn*, we held in *State ex rel. Phillips v. Legursky*, 187 W.Va. 607, 420 S.E.2d 743 (1992), that the lack of a transcript of an in-camera hearing did not give rise to error of constitutional dimension, and therefore, was not reviewable by writ of habeas corpus. Similarly, in *State ex rel. Boso v. Hedrick*, 182 W.Va. 701, 391 S.E.2d 614 (1990), we concluded that rulings made by the trial court concerning the state's opening argument, the giving of an instruction, the denial of the defendant's motion for severance of the counts in the indictment, the granting of the State's motion in limine, and the refusal to strike for cause members of the juror venire were all trial errors not involving constitutional dimensions. *Id.* at 710, 391 S.E.2d at 623 and n. 6.

■ Based on the above-mentioned precedent of this Court, the trial court's refusal to order a psychiatric examination of the victim and the trial court's allowing the victim to testify both fall into the realm of trial errors which do not rise to a constitutional level. Accordingly, we decline to review either of these errors raised by the Appellant. *See Mohn*, 163 W.Va. at 130, 254 S.E.2d at 806, Syl.Pt. 4.

Based on the foregoing, the decision of the Circuit Court of Raleigh County is hereby affirmed.[30]

Affirmed.

BROTHERTON and CLECKLEY, JJ., did not participate.

FOX and STEPHENS, JJ., sitting by temporary assignment.

McHUGH, C.J., and NEELY, Retired Justice, dissent, and reserve the right to file dissenting opinions.

McHUGH, Chief Justice, dissenting:

(filed Dec. 14, 1995)

I dissent only to that portion of the majority's opinion which concerns the State's use of a peremptory challenge to remove a black juror from the jury panel. More specifically, I disagree with the majority's conclusion that the appellant failed to establish a *prima facie* case of racial discrimination pursuant to the law enunciated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and adopted by this Court in *State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989).

Purposeful discrimination against a cognizable racial group in any context should be prohibited. This is particularly true, however, in judicial proceedings where it is of utmost importance that society have confidence that justice is being meted out with an even hand.

Through the years courts have slowly been forced to acknowledge that they must continue to take an active role in forcing the participants in the criminal justice system to act in a non-discriminatory manner. As early as 1880 the Supreme Court of the United States held that a State could not purposefully exclude members of a defendant's race from the jury without violating a black defendant's right to equal protection. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880).

More recently, as stated by the majority, the Supreme Court of the United States in *Batson v. Kentucky, supra*, held that it is a violation of the equal protection clause for a prosecutor to peremptorily strike a potential juror solely because of his race. *Batson* further elaborates that a defendant may prove a *prima facie* case of discrimination by showing that he or she is a member of a cognizable racial group and that the prosecutor has used his or her peremptory challenges to remove a potential juror of the defendant's race. *Id.* In arriving at its conclusion, the Supreme Court of the United

---

**30.** Upon a review of the record, we find the remainder of the Appellant's arguments, including the State's failure to reveal to the Appellant the results of Dr. Slack's physical examination and the C.I.B. lab report prior to trial, without merit. Further, we also conclude that the Appellee's contention that the Appellant is barred from seeking reversal of his original felony conviction by habeas corpus proceeding by virtue of the fact that the Appellant, following his conviction and sentencing, unlawfully fled the jurisdiction where he remained at large for years before his capture and extradition back to this state is without merit.

States explained that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 81.

We adopted *Batson* in *State v. Marrs,* 180 W.Va. 693, 379 S.E.2d 497 (1989):

2. To establish a prima facie case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State, 'the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' [Citations omitted.] *Batson v. Kentucky,* 476 U.S. 79 at 96, 106 S.Ct. 1712 at 1722, 90 L.Ed.2d 69 (1986).

3. The State may defeat a defendant's prima facie case of a violation of equal protection due to racial discrimination in selection of a jury by providing non-racial, credible reasons for using its peremptory challenges to strike members of the defendant's race from the jury.

Syllabus points 2 and 3 of *Marrs, supra.*

The majority maintains that the appellant has failed to establish a *prima facie* case for violation of equal protection due to racial discrimination in the use of peremptory jury challenges by the State because he is not a member of the *same* cognizable racial group as the juror who was stricken. More specifically, the majority acknowledges that the appellant was from a cognizable racial group by virtue of his Indian ethnicity; however, the majority maintains that because the juror

who was removed from the jury was African–American, he was not a member of the appellant's racial group, making *Marrs* inapplicable. I disagree with the majority's narrow application of the test set forth in *Marrs, supra.*

The record in the case before us reveals that the appellant's skin color was almost as dark as the black lawyer representing him in the habeas proceeding:

Q [by appellant's attorney] ... How would you describe your color and race?

A [by appellant] I am of a non-white race, more toward black.

Q In this particular country, have people referred to you as being black?

A Oh, I've been—I've had people come up to me and call me nigger several times.

Q The—for the record, Mr. Azeez [the appellant], are you lighter or darker than I am, the attorney talking to you?

A We're about the same color. I may be a little, a shade lighter than you.

Q How much lighter are you?

A Not much.

Q I mean, how would you describe that for the record?

A We are the same color, about the same color.

In fact, during the State's cross-examination the appellant makes it clear that his skin color is black:

Q [by the State] Mr. Azeez [the appellant], are you Negro; do you call yourself Negro?

A I'm not white.

Q Do you call yourself Negro?

A I do not know how to answer the question.

Q You don't know? When you fill out forms, and you have choices, like Caucasian, Negro, do you check, 'I don't know'?

A If there is white or black, I put black.

After further questioning by the State, the appellant testified that if it was an option he would choose Indian; otherwise, he would put black when he was filling out forms.

I fail to see how the majority could conclude from the above testimony that the appellant was not a member of the same racial group as the juror who was stricken. Indeed, the pictures of the appellant introduced at the habeas corpus proceeding clearly reveal that he is not a Caucasian. Furthermore, as appellant's testimony illustrates, he is no stranger to racially discriminatory slurs historically used to degrade and belittle individuals of African–American descent. Clearly, then, the fact that the appellant is of Indian descent and not African descent is a distinction without a difference. Accordingly, I find that the appellant has established a *prima facie* case for a violation of equal protection due to racial discrimination in the use of peremptory jury challenges pursuant to *Marrs, supra.*[1]

Furthermore, I am not convinced, unlike the trial judge in the habeas proceeding below, that the prosecutor articulated a "nonracial, credible reason[ ] for using its peremptory challenge[ ] to strike members of the [appellant's] race from the jury." Syl. pt. 3, *Marrs, supra.* As pointed out by the majority, the prosecutor explained that "[t]he State made the strike ... on the basis that he [the black juror] said he knew Cedric [the investigating officer]. We speculated that maybe Cedric had arrested him, we don't know."

In *Marrs,* we found that the prosecutor failed to articulate credible reasons for striking the only black potential juror remaining on the jury venire. The prosecutor stated that based on the black juror's last name, she thought he may have been related to someone who had criminal charges pending against him. Thus, the prosecutor struck the black juror from the jury. In concluding that the prosecutor failed to articulate a credible reason for striking the black potential juror, this Court has quoted the following from *Batson:* "If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause 'would be but a vain and illusory requirement.'" *Marrs,* at 696, 379 S.E.2d at 500

(*quoting Batson,* 476 U.S. at 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88). This Court pointed out that the prosecutor did not ask the black potential juror directly whether or not he had a relative who had a criminal warrant pending against him.

Likewise, in the case before us, the prosecutor's speculation that the black potential juror *may* have been arrested by the investigating officer is too speculative and general to be a credible statement. Indeed, three other potential jurors stated that they knew the investigating officer. The prosecutor questioned them and discovered that one potential juror, who was ultimately selected for the jury panel, was at one time a neighbor of the investigating officer. Another potential juror knew the investigating officer in his official capacity because of her teenage son, and another potential juror knew the investigating officer because he grew up in her neighborhood. Oddly, the prosecutor failed to question the black potential juror about how *he* knew the investigating officer.

This is a situation where a trial court should have conducted an evidentiary hearing:

> A trial court should conduct an evidentiary hearing if, after considering the prosecutor's representations regarding the reasons for using a peremptory strike to exclude the only remaining black juror, the court deems that the circumstances surrounding the prosecutor's representations warrant such a hearing to determine whether the explanations offered by the prosecutor in exercising said strike were racially neutral or discriminatory in nature. The determination on whether to conduct an evidentiary hearing is within the sound discretion of the trial court.

Syl. pt. 9, *State v. Kirkland,* 191 W.Va. 586, 447 S.E.2d 278 (1994). Allowing the State to give a speculative reason for striking the black potential juror without conducting an evidentiary hearing was a clear abuse of discretion by the trial judge in the case before us.

---

1. I recognize the importance of preemptory challenges; however, their use in a racially motivated manner cannot be condoned.

Accordingly, based on the above discussion, I respectfully dissent. I am authorized to state that Justice Neely joins me in this dissent.