692 S.E.2d 307

**In re KATELYN T. and Joel T.**

**No. 35138.**

Supreme Court of Appeals of
West Virginia.

Submitted March 3, 2010.

Decided April 14, 2010.

**266**

Linda Hausman, Kaufman & McPherson, PLLC, Bridgeport, WV, Petitioner and Guardian ad litem on behalf of the minor children, Katelyn T. and Joel T.

Betsy Griffith, Bridgeport, WV, for the Respondent, April P.

Darrell V. McGraw, Jr., Attorney General, Charleston, WV, Katherine M. Bond, Assistant Attorney General, White Hall, WV, for the Petitioner, West Virginia Department of Health and Human Resources.

PER CURIAM:

The appellants herein, the guardian ad litem for the minor children (hereinafter "GAL") and the West Virginia Department of Health and Human Resources (hereinafter "DHHR"), jointly appeal from a February 25, 2009,[1] order from the Circuit Court of Harrison County. By that order, the circuit court dismissed the abuse and neglect case against the appellee mother, April P.[2] (hereinafter "April" or "mother"), and her boyfriend, Michael A., Sr. (hereinafter "Michael"

or "boyfriend"),[3] and ordered that the children, Katelyn T. (hereinafter "Katelyn") and Joel T. (hereinafter "Joel"), be returned immediately to their mother's custody. On appeal to this Court, the GAL and the DHHR argue that the circuit court rulings were in error. They contend that the clear and convincing evidence shows that the minor children were sexually abused by the mother's boyfriend and, further, that the mother's refusal to recognize the abuse illustrates her inability to protect them. Based on the parties' arguments, the record designated for our consideration, and the pertinent authorities, we reverse the rulings made by the circuit court, and remand the case for further proceedings consistent with this opinion.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The minor children at issue in this case are Katelyn[4] and Joel,[5] born to biological parents April and Joshua T.[6] The evidence shows that the children had resided on the mother's family's farm for the majority of their lives. During their time on the family farm, the children lived mainly with their maternal grandmother, Charlotte P. (hereinafter "grandmother" or "Charlotte"), both with and without their mother. The maternal aunt, Janet P. (hereinafter "aunt" or "Janet"), was materially involved with the children's care and upbringing and lived at her own residence, also located on the family

---

1. While the written order was entered February 25, 2009, the lower court announced its ruling from the bench on February 18, 2009. On that same day, the GAL filed a motion for stay with this Court, which was denied. The circuit court then entered its February 25, 2009, written order, which is the subject of this appeal.

2. "We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987) (citations omitted).

3. The boyfriend, Michael A., Sr., was a party to the underlying action but does not appear before this Court.

4. Katelyn's date of birth is June 8, 2004. At the time of the filing of the underlying petition alleging abuse, Katelyn was four years old.

5. June 30, 2005, is Joel's birth date. Joel was three years of age at the time of the filing of the abuse and neglect petition.

6. The February 25, 2009, order by the circuit court found that Joshua T. abandoned his children and, further, adjudicated him as a neglectful parent. The lower court terminated Joshua T.'s parental rights to both infant children. The termination of Joshua T.'s parental rights was not appealed.

farm. At times, the children lived in Janet's home. April lived on this family property for much of the time until June 2007 when she left the farm and moved in with her boyfriend, Michael.[7] When April moved from the family farm, the children continued to reside primarily with their grandmother, Charlotte, at her residence. The testimony before the circuit court showed that April, the mother, would take the children for weekends initially, and that this time grew to be alternating weeks with the children spending a week at Charlotte's home, followed by a week with April at her boyfriend's house.[8]

The grandmother and the aunt first became concerned when the children were found, on two occasions, running around naked. When questioned about the behavior, the children stated that the mother's boyfriend had told them to take their clothes off. The aunt testified that she could no longer overlook the children's behavioral oddities after an incident at the end of March 2008 when Katelyn stated that the boyfriend's "pee pee" had white "milk" squirt from it, that she had touched it, and that it was big and ugly. On May 14, 2008, the aunt, Janet, sought an emergency protective order based on the allegations set forth by Katelyn.[9] The requested relief was granted, and a final hearing was held May 27, 2008. At this final hearing, April agreed to continue the matter so that the children could undergo a sexual abuse evaluation, and she further agreed that the children could continue to live with the grandmother, with care also being provided

to her children by the aunt. It was determined that Margaret Tordella would perform the evaluations.[10] A hearing was held on June 6, 2008, and the emergency protective order was reaffirmed. On November 10, 2008, during a hearing regarding the emergency protective order, the parties revealed the intent to file a private abuse and neglect petition. On that date, an order was issued terminating the emergency protective order, effective at the end of the day on November 14, 2008.

On November 10, 2008, a petition was filed by the maternal grandmother and maternal aunt, alleging abuse and neglect by the mother and biological father. The DHHR sought, and was granted, emergency custody of the children on November 14, 2008. The basis of the abuse and neglect allegations was that the children had been sexually abused by the mother's boyfriend, Michael A., Sr. Specifically, it was alleged that the boyfriend had been masturbating while the children were in his care and that he placed Matchbox cars in his pants and asked the children to retrieve them. Joel described "milk" coming out of the boyfriend's "pee bug," and Katelyn described the "dog hair" around his "pee bug" and the "milk" that would squirt from it. The mother informed the aunt and grandmother that, upon expiration of the emergency protective order, when the children would be returned to her care, she planned to leave the state with them. This threat prompted the filing of the instant petition. Emergency custody was granted to the DHHR on No-

---

7. Michael is the accused sexual abuser identified by the children. During oral argument before this Court, it was reported that the mother, April, continues to live with Michael and, further, that the couple has a newborn child together.

8. Janet also testified that there were times when the children were in her and the grandmother's care, and April could not be found. It appears that there were also times when the grandmother and aunt needed items, such as the children's car seats, and April could not be located to provide such items.

9. Prior to the filing of the emergency protective order, the aunt had attempted to find help through a "hotline." She had also attempted to involve the biological father and had him sign guardianship papers expressing an interest in the

aunt caring for his children. Further, a referral was made to the DHHR alleging sexual abuse on May 12, 2008. The children were interviewed on May 16, 2008, and the child protective services worker reported that, while she had a difficult time obtaining any information from the children, Katelyn did state that toys come out of Michael's "pee wee" in the bathtub, but that she did not see it. The child protective services worker contacted Ms. Tordella, a licensed social worker and counselor who had been working with the children, in late August and was informed that Ms. Tordella was not getting very far with the children, but that Joel had reported that "milk" came out of Michael's "pee bug." The child protective services worker closed her file at that point.

10. *See supra,* note 9.

vember 17, 2008, and the children remained in the physical custody of the aunt.

An amended petition was filed on November 21, 2008, again by the aunt and grandmother, and now joined by the DHHR, and adding the mother's boyfriend, Michael, as a respondent. The petition contained the same allegations as the initial petition, with the addition that Katelyn had told Ms. Tordella, a licensed social worker and counselor, that the boyfriend had kissed her on the lips and that Joel told Ms. Tordella that the boyfriend placed cars in his own "butt" and that Joel had to retrieve them. He described the cars as being covered with "poop" when he retrieved them. Both children told Ms. Tordella that the boyfriend was mean to them, and that the boyfriend played with the Matchbox cars on his own "pee bug," and that the boyfriend's "pee bug" squirted "milk." The petition alleged that the children had been exposed to unsafe conditions, that the mother had subjected them to drug abuse, that the mother failed to provide Joel with appropriate medical care,[11] and that the mother knew or should have known that her children were being sexually abused and failed to protect them.

An adjudicatory hearing was held December 11, 2008, but had to be continued so that the children could undergo a second sexual abuse evaluation, performed by Chanin Kennedy, upon agreement of the parties. The adjudicatory hearing continued on January 22, 2009; February 2, 2009; and February 4, 2009. During the adjudicatory hearings, two expert opinions were introduced on behalf of the petitioners. The experts, Margaret Tordella and Chanin Kennedy, both testified on behalf of the children.

Margaret Tordella began working with the children prior to the filing of the abuse and neglect petition. In performing her evaluation, Ms. Tordella interviewed the children a total of seventeen times from May 30, 2008, through December 5, 2008. The interviews, with the exception of two occasions, occurred with the presence of both children because attempts to separate them for private sessions were unsuccessful.[12] During these sessions, the children revealed instances of inappropriate sexual behavior by Michael, the mother's boyfriend. At the June 10, 2008, session, Joel referred to a matchbox car that he saw on Ms. Tordella's desk. He offered that Michael put cars in Michael's "butt" and would have Joel retrieve them. Joel stated that they would have "poop" on them when they came out. On July 18, 2008, Joel disclosed to Ms. Tordella that Michael played with cars on his "pee-bug" and that "milk" then came out of Michael's "pee-bug." Katelyn was present and agreed that this occurred. Joel was able to differentiate between the yellow urine that comes out of his own penis as being different from the white "milk" that he saw coming out of Michael's "pee-bug." At a subsequent session, the children again referred to Michael playing in his "butt" and on his "pee-bug" with Joel's cars. Further, Katelyn stated that she saw hair on Michael's "pee-bug." On October 31, 2008, the children again discussed the white "milk" that comes out of Michael's "pee-bug." According to Ms. Tordella, the children indicated that all of these incidents occurred at Michael's home. While there was testimony that the mother, April, was home during these occurrences, there was no indication that she was in the room during any of the events in question. During her testimony at the adjudicatory hearing, Ms. Tordella opined that the children's sexual knowledge was not appropriate for their ages. Importantly, she found the children's reporting to be consistent and credible, and further opined that she did not feel that the children had been coached.

Chanin Kennedy is a licensed psychologist who performed the sexual abuse evaluation after the institution of the abuse and neglect petition. She met with the children individually on January 8, 13, and 15, 2009. Even though she was able to separate the children for their sessions, Ms. Kennedy agreed that the children were resistant to being isolated

---

**11.** This allegation stemmed from the fact that Joel has a lazy eye for which his mother was not seeking treatment in spite of having a medical card.

**12.** Katelyn was able to attend a private session on two occasions because Joel was asleep during one meeting and uncooperative during the other session.

from each other. Ms. Kennedy also met with the mother, April, on January 13, 2009, and with the aunt, Janet, on January 14, 2009. According to Ms. Kennedy's testimony during the adjudicatory hearings, both children were difficult to interview and both exhibited age-inappropriate sexualized behavior. During one of the sessions, Katelyn revealed that her mother's boyfriend, Michael, showed his "pee pee" to her and to her brother, and that it squirted "milk." In describing how his "pee pee" squirted "milk," Katelyn stated that Michael "shaked it himself with his hand." Joel, during his individual sessions with Ms. Kennedy, disclosed that Michael's "pee pee" squirts "milk" and that his sister, Katelyn, had touched Michael on his "pee pee." Ms. Kennedy reported that there was no evidence presented by the children that the mother knew about any of the children's stories or that she was present in the room when any of the actions occurred. Based upon her evaluation, Ms. Kennedy also reported that she does not feel that the children are vulnerable to coaching by others and their reporting was credible. Ultimately, Ms. Kennedy determined that the children exhibited age-inappropriate sexual behavior and, further, that the children had, in fact, been sexually abused.

Ms. Kennedy also testified about her sessions with the mother and the aunt. As a result of those meetings, Ms. Kennedy was left with the impression that the mother did not believe that anything inappropriate had occurred. She further testified that April stated she was aware of the abuse allegations prior to the filing of the abuse and neglect petition. While April stated that she would leave Michael if a court order required her to do so, she also presented many excuses as to why she could not leave him. Ms. Kennedy found that the mother presented a high risk factor for returning to Michael even if ordered to separate for the benefit of the children. Further, Ms. Kennedy found that the aunt, Janet, sincerely was concerned for the health and welfare of the children and that she had no other motive for her allegations.

The children's mother, April, also testified at the adjudicatory hearings. She stated that she does not believe that her boyfriend, Michael, did anything sexually inappropriate with the children. To explain her children's knowledge of age-inappropriate sexual acts, she offered that perhaps they had walked in on her boyfriend's adult son while he was watching cartoons with sexual content. April also suggested that Katelyn had walked in on Michael while he was urinating in the bathroom. Further, she testified that they had no matchbox-style cars in the home and that the only cars in the home were much larger than a matchbox car; thus, she did not believe that her son, Joel, had created the story of the cars being placed in Michael's rectum on his own but, rather, that someone had provided him such information. However, all of these possible explanations for the children's exposure to sexual knowledge were discounted and contradicted by the testimony of Michael's adult son, who also lives in the home. Michael's son testified that the cartoons he watched contained scenes of naked breasts, but no masturbatory scenes. Further, he testified that the family members always made it a practice to lock the bathroom door behind them. Most significantly, he testified that the house contained many matchbox-size cars, describing a car size that directly contradicted the children's mother's testimony. He also stated that Joel has a carrying case that holds at least thirty-two of the small matchbox-size cars.

The lower court issued its adjudicatory order orally on February 18, 2009,[13] followed by its written order of February 25, 2009, which order is the subject of this appeal. In its order, the lower court found that sexual abuse had not been shown by clear and convincing evidence. The order states that the children have told inconsistent statements to five individuals and, therefore, are not credible. Further, the circuit judge discounted the findings of Ms. Tordella because she interviewed the children together instead of separately,[14] as would be normal protocol.

---

13. A motion to stay the underlying ruling was filed with this Court on February 18, 2009, which was denied.

14. Ms. Kennedy also expressed concern with Ms. Tordella's interview techniques. Ms. Tordella explained that the children were impossible to separate and would cry and cling to one another.

Thus, the order reasoned that the children were already tainted by the time they met with Ms. Kennedy, and her opinions were discounted for that reason. The order also took issue with the legal maneuverings of the parties and suggested that the aunt and grandmother had used and manipulated the system.[15] Therefore, the lower court dismissed the case against the mother and the boyfriend and ordered that the children be returned to their mother that same afternoon. The appeal by the GAL and the DHHR is now before this Court.

## II.

### STANDARD OF REVIEW

■ This case is before this Court on appeal from the circuit court's order dismissing the abuse and neglect petition and finding a lack of clear and convincing evidence of sexual abuse of the minor children. This Court has previously explained that, in the realm of an abuse and neglect case,

> [a]lthough conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused

or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In the Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). Mindful of the applicable standards, we proceed to consider the parties' arguments.

## III.

### DISCUSSION

Before this Court, the GAL and the DHHR filed a joint petition for appeal asserting the following three assignments of error: (1) the lower court erred in finding a lack of clear and convincing evidence of sexual abuse, (2) the circuit court erred in holding the legal maneuverings of the parties against the children and failing to rule in the best interests of the children,[16] and (3) the lower tribunal erred in dismissing the case against

---

Ms. Kennedy likewise found the children to be very difficult to interview and had to schedule additional sessions with them above and beyond the normal practice. Despite Ms. Kennedy's trepidation with Ms. Tordella's tactics, she ultimately arrived at the same conclusions that the children had been sexually abused, were credible, had experienced the instances firsthand, possessed sexual knowledge inappropriate for their ages, and did not exhibit signs of being coached.

15. In addition to the emergency protective order and the private abuse and neglect proceeding, the aunt had also talked the biological father into filing a motion for custody so that she could intervene in the matter as she did not have standing on her own to file such an action. The lower court found that the aunt had been involved in five different court proceedings in an attempt to gain custody of the children.

16. Because of the manner in which we decide the first assignment of error, we need not address this issue of the lower court's perception of the parties' legal maneuverings. However, we note our concern that the parties' behavior and

the lower court's dislike for the same was elevated above a concern for the well-being of the children. *See* Syl. pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("[T]he primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."). The circuit court found that the aunt "has been involved in five attempts to obtain custody of the children" and that "in this case the system was being used and manipulated and that needs to stop." While we agree that manipulation of the legal system is inefficient and improper, we also note that our independent review of the record, as well as the experts' opinions in this case, shows a family member who was sincerely and genuinely concerned about the well-being of these children and was clearly desperate to explore any avenue that may provide assistance to the children. As such, we decline to elevate any disdain for the procedural improprieties over our mandate to hold the welfare of the children as the polar star by which this Court will be guided.

the mother because she failed to acknowledge that her boyfriend sexually abused her children and, therefore, failed to protect them. In response, April, the mother, argues that the rulings of the circuit court should be affirmed because there was no evidence that she abused or neglected her children or that she failed to protect them from abuse. She asserts that there was no evidence that her boyfriend sexually abused her children. Further, she argues that there was no evidence that she had knowledge of allegations of child abuse by her boyfriend or that she failed to protect her children as a result of having any such information.

Finding it dispositive of this case, we will first address the GAL and DHHR's argument that there existed clear and convincing evidence that the children were sexually abused. In that regard, W. Va.Code § 49-1-3(a) (2007) (Repl. Vol. 2009) defines an "[a]bused child" as a "child whose health or welfare is harmed or threatened by ... [s]exual abuse or sexual exploitation[.]" Pertinent to the facts of the present case, the term "sexual abuse" includes

> [a]ny conduct whereby a parent, guardian or custodian displays his or her sex organs to a child, or procures another person to display his or her sex organs to a child, for the purpose of gratifying the sexual desire of the parent, guardian or custodian, of the person making such display, or of the child, or for the purpose of affronting or alarming the child.

W. Va.Code § 49-1-3(*l*)(C). In examining the evidence in this case, we are mindful that "[t]he findings [of abuse or neglect, if applicable] must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing proof." W. Va.Code § 49-6-2(c) (2006) (Repl. Vol. 2009). We are guided by the proposition that

> " 'W. Va.Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Human Services], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition ... by clear and convincing proof."' .... Syllabus Point 1, *In Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867

(1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.,* 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth,* 192 W.Va. 656, 453 S.E.2d 639 (1994).

Syl. pt. 3, in part, *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995). While the statute requires the DHHR to prove the conditions existing at the time of the filing of the petition by clear and convincing proof, "[t]he statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syl. pt. 1, in part, *In the Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981).

In the present case, the circuit court stated as follows:

> This Court realizes its duty to protect the children, but parents also have rights and allegations of sexual abuse have serious and lifelong consequences to those who are so accused. However, the petitioners have the burden of proof by clear and convincing evidence that these children have been abused or neglected at the time the petition was filed and they have failed to meet that burden not only with respect to these allegations, but also all other allegations set forth in the Petition and Amended Petition including the allegations that the mother has a substance abuse problem or that Michael ... or April ... physically abused the children.

The DHHR submitted testimony from two mental health experts to support its claims of sexual abuse. The respondent mother and the mother's boyfriend presented no contrary expert evidence. Thus, to find that no clear and convincing evidence existed, the circuit court disregarded the testimony of two mental health experts, which was the only expert testimony in the case. In regard to the first expert, Margaret Tordella, the circuit court found that "Tordella's interviewing of the children violated standard protocol of evaluation of children suspected of sexual abuse in that she interviewed them together." Further, the lower court stated as follows:

> The Court finds that the interview techniques used by Tordella regarding the in-

terviewing [of] the children together; the fact that on numerous occasions she got no information from the children; the fact that the children would want to mirror and do what the other was doing in the session; the lack and [sic] consistency in what the children told her in sixteen joint sessions; the fact that nothing was disclosed by Katelyn on the one occasion in which she was alone with her and that was the only occasion that her mother brought her to Tordella's office; and that Tordella was trying to do both an evaluation and therapy. Therefore, her opinion in this case as to whether or not these children were sexually abused is not worthy of any belief.

In reviewing the testimony of the second expert, Chanin Kennedy, the lower court found that "Kennedy expressed concern over Tordella's deviation from standard protocol in seeing the children together; in taking six months to do forensic interviews; and if Tordella was doing both evaluations and therapy, it was inappropriate. Kennedy did not get to see these children until after they were contaminated by Tordella." Thus, the circuit court disregarded the findings made by Ms. Kennedy as being tainted due to the previous inappropriate interview techniques employed by Ms. Tordella.

However, we determine this finding by the circuit court to be misguided. In examining the testimony adduced at the adjudicatory hearing, it is significant that the only expert testimony in this case was submitted by the DHHR. In her testimony, the following information was elicited from Ms. Tordella:

Q. Okay. And did you meet with the children together or separately?

A. I met with the children together. They would not separate. I found the children to be very shy and clingy to one another. They would not separate. They would, you know, at the very first—well, this was the very first session because Janet had to be in the room for the other one to provide some of the information, and they would not separate. They would not even come down the hallway with me alone, so she had to walk down the hallway, and then made the excuse she needed to use the restroom so she could leave.

. . . .

Q. —is it fair to say that in all the sessions you saw the children together?

A. In most of all the sessions. Towards the end after Katie started in school and she was more willing to separate, I saw her, I think, twice without Joel.

. . . .

Q. Let me ask you, these children at the outset when you started seeing them were three and four years old?

A. Yes.

Q. Is their sexual knowledge appropriate for their age?

A. No, it's not.

. . . .

Q. Have they been consistent in the information that they have provided to you in your opinion?

A. Yes, they have. I mean they began telling me that—telling me bits and pieces at the very beginning of, you know, when I first started seeing them and they've been consistent throughout—

Q. Okay.

A. —telling me more.

. . . .

A. . . . I also attempted, too, to see the children separately. In the very beginning there was no way. I had tried to bring back, you know, had said, well, this will be Katie's turn, and then Joel will have a turn. They cried and carried on and would not agree to that. Now later on, I did see Katie twice alone. One time was because Joel was asleep and the other time was because Joel was uncooperative. But I think part of what had happened is Katie had started going to school, and so she was more used to separating from Joel.

Q. Let me ask you, given the fact that the children saw you jointly, and that the children heard what each other was saying, do you believe that in anyway tainted the statements you were receiving from the children?

A. No, because there was collaboration from the children when they told me that. You know, one would make a statement and another one would add to it.

Q. Did they appear to be spontaneous statements or rehearsed?

A. They were spontaneous because at times they took me by surprise when they said them.

. . . .

Q. So would it be safe to say that you believe you would not have this little bit of disclosure had you tried to separate the siblings?

A. I don't believe they would've. I would've—I think they would've seen me as one of the mean people and would not have talked to me.

Q. Do you believe the children were credible in what they reported?

A.. I believe they were credible because they were consistent in reporting this. I mean there were gaps in my seeing them because of—Friday was the best day to see the children because that was on a day that Katie was in school so things were calmer and stuff, and it was always later in the afternoon for convenience to the family. And there were times—a number of times where I had to cancel because I got called out on a crisis. The children through the fall seemed to be—have, you know, pink— they had pinkeye, ear infections, colds, so they had been through a lot. There were a number of gaps yet they would come back and be consistent in telling me what they—

Q. Based upon—

A. —you know, the same information.

Q. —your previous experience working with other children, you had testified earlier you do not believe the children were coached?

A. No. You know, the standard is that if the child is able to tell you three times then it's a believable statement. I asked them in different ways. We would, you know, there were times, you know, usually if a child is coached, the first thing

they tell you when they walk in—and especially children this young age, they would blurt everything out because they would remember. We would be in there playing. We would be in the room for a period of time having played and talked and done different things, and they would come out with this information. You know, and it appeared that it was information that they were remembering or responding to.

Further, on cross-examination, Ms. Tordella recognized that she violated the standard protocol in interview techniques, but explained that "my preference usually is to interview children alone. I could not get these children to separate."

Significantly, the second expert, Chanin Kennedy, directly addressed and rebutted the circuit court's concerns in her testimony. The relevant portions of her statements made during the adjudicatory hearing are as follows:

Q. Was it correct that these two children were very hard to separate?

A. They were hard to separate from each other and they were hard to separate from their maternal grandmother and aunt who brought them to the session. It's standard protocol to interview the children individually without other adults present. And just getting them to cooperate in general was very difficult. Getting them to sit at the chairs. Sit at the table. Be directed to activities we were working on. All of those things were very difficult.

. . . .

Q. But you interviewed them separately?

A. Correct.

. . . .

Q. Did you believe from your sessions with the children that they had been coached?

A. No. There was no evidence based on the information that's been provided to me that the children have been coached. Their statements are spontaneous. They've given information that have [sic] not—have [sic] not been previously disclosed or known to their grandmother,

to Janet, or to any other party, including Peggy Tordella.

Q. Now you're aware of the interviews with Peggy Tordella, correct?

A. Yes.

Q. Have you seen the reports from Peggy Tordella?

A. Yes.

Q. Obviously there's a concern that Ms. Tordella interviewed both children together?

A. Yes.

Q. Could that have changed—tainted what the children disclosed to you?

A. It certainly complicates issues in the sense that the children were interviewed together. And one disclosure from one child could potentially contaminate the other child, and so it makes it more difficult to be able to say with any kind of certainty whether both children experienced this or one did and heard the other talking about it.

I think what has helped me have a better understanding of the children's perspective is that Katie made a disclosure to me that was not made to Peggy Tordella, to her grandmother, or to her aunt, and is information that a four-year old child could not just spontaneously make up. It would be information that would had—had to have been observed and that's the shaking the penis to make milk come out statement.

Q. Okay. So she said he shook the penis to make the milk come out?

A. "His pee-pee squirts milk. He shaked it himself with his hands and milk squirted out."

Q. Okay. Did Joel make any independent disclosures that he had not made previously?

A. Joel's statements were more consistent with what he had talked about previously with Peggy, the milk squirting out. Although Peggy documents that that was a disclosure that Joel had made first to my recollection in her sessions and that Katie—that Katie had touched Mike's pee-bug.

. . . .

Q. . . . do you believe that the children have inappropriate sexual knowledge?

A. Yes.

. . . .

Q. Do you believe, in looking at all the information that you have, that these children have been consistent?

A. With the core details, the children have been consistent regarding inappropriate sexual contact with their mother's boyfriend, Mike. I think due to a lot of barriers the children haven't been able to provide the level of peripheral, the details around the core details, that I would like to see. I think their age is a barrier. I think the fact that they had previously been evaluated is a barrier. I think these are kids that have a very unstructured kind of day with grandma and it's very difficult to get them used to a more structured forensic interview. I think those have all been barriers to gain additional information.

Q. Do you believe that there's consistency from their disclosures to Peggy Tordella up until the time of their disclosures to you?

A. Your question is are the details consistent between myself and Peggy?

Q. Yes.

A. Yes, they appear to be.

Q. Now given that Ms. Tordella interviewed the children together, do the disclosures made to Ms. Tordella lack credibility as far as you're concerned?

A. Not—they don't lack credibility. They certainly make it more difficult to fully assess the children because the children were interviewed together, and as I've stated before, an interview in front of another child questions whether both children experienced this or just one.

It's my understanding that the children had given to their grandmother and to their aunt some spontaneous disclosures before they had ever met Peggy, suggesting that both children had witnessed and or experienced some level of inappropriate sexual contact with Mike. Spe-

cifically that he—Mike had told them to get naked with him. Joel had said that Katie had touched Mike's pee-pee. Katie had said that white milk had come out of Mike's pee-pee. And so these were statements that were made prior to contact with Peggy, and certainly consistent with information they gave me.

. . . .

Q. After conducting all of your interviews, were you able to come to any conclusions?

A. The children are exhibiting sexualized behaviors and knowledge that are not age and or developmentally appropriate. They're exhibiting emotional and behavioral characteristics that are often seen in sexually abused children. The children I have—I believe are having difficulty articulating what they've observed, what they've—what has happened to them because of their young age.

I think I have identified concerns regarding their mother's tendency not to respond to the allegations. When I spoke to April she had a plan to stay—stay with Mike. She had—she's pregnant with Mike's baby. She didn't have a plan to separate. I asked her if the court ordered her or required her to separate would she be able to do that? And she was really vague about how she would do that. Very inconsistent about whether she would really be willing to follow through with that.

The children, I think, are experiencing some adjustment related problems as far as poor boundaries with others, lacking trust of others, being withdrawn, some social skills deficits that I believe could be worked on. And so overall, that would be my diagnostic impressions.

Further, on cross-examination, Ms. Kennedy testified as follows:

Q. Given all of those criteria, and I think you said before there was eight total, all of those criteria, do you believe that the children's reporting is credible?

A. I've diagnosed them as sexually abused children and I think that they demonstrated a level of credibility given the barriers that we have, yes.

Thus, both experts squarely addressed and refuted the circuit court's basis for disregarding their opinions, that being the failure of the first expert to follow the standard protocol in interviewing these children. While we do not condone nor view lightly such a failure to follow the normal procedure, we recognize that this Court encountered a similar situation, involving the same mental health practitioner, in a previous case. In the case of *In re: Tonjia M.*, 212 W.Va. 443, 573 S.E.2d 354 (2002) (per curiam), this Court affirmed the lower court's termination of the father's parental rights. In that case, Ms. Tordella was involved in a sexual abuse case wherein her interview techniques with the child were called into question by a subsequent expert. However, in the *Tonjia M.* case, unlike the present case, the second expert could not confirm Ms. Tordella's opinion and, rather, found that she could neither confirm nor deny that sexual abuse had occurred. The lower court in *Tonjia M.* recessed the proceedings to have a third mental health expert, Chanin Kennedy, who happens to be the second expert in the case currently before this Court, perform an independent evaluation. Ms. Kennedy, in the *Tonjia M.* case, found that the child exhibited sexual behaviors inconsistent with other children in her age group. Based on this testimony, the lower court found that Tonjia M. was a victim of sexual abuse and terminated the parental rights of her father. The termination was affirmed on appeal to this Court, based, in part, on the opinion of Ms. Tordella and the two other experts in the case. While recognizing the inadequacies in Ms. Tordella's interview tactics in this case, this Court, like the Court in *Tonjia M.*, will rely on her opinion due, in large part, to her full and adequate explanation as to her reasons for deviating from standard protocol. Further, the subsequent explanation by Ms. Kennedy, while recognizing the faults with Ms. Tordella's interview styles, fully explained the impact of Ms. Tordella's actions. Ms. Kennedy further elaborated on her ultimate opinion in the case, which was similar in all significant respects to Ms. Tordella's, despite any procedural failures by Ms. Tordella.

Therefore, we find it was clear error for the circuit court to disregard the only expert evidence in the case. Both experts addressed the deviation in the interview techniques employed by Ms. Tordella, and, while Ms. Kennedy did not agree with the methodology, both opined that it did not alter their final opinions in the matter. Not only did both experts agree that the interview techniques did not change the outcome in this case, but both experts also found that these children were credible reporters, were consistent with their disclosures over time, and did not raise any suspicions that they had been coached. Importantly, Ms. Kennedy, although not in agreement with Ms. Tordella's interview techniques, found that it did not taint her examination of the children. The testimony of two independent mental health professionals, who both reached the conclusion that the children were sexually abused by the boyfriend engaging in self gratification, was clear and convincing evidence that abuse has occurred.

In making this determination, we recognize that both experts stated that the children reported that their mother was not present in the room when these instances took place. Acknowledging that the statute requires that "[t]he findings [of abuse or neglect, if applicable] must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing proof[,]" W. Va.Code § 49–6–2(c), the lower court found that "April ... was not present when any of the alleged events happened in Mike's house in his living room." Further, the lower court found that

[a]t the time of the filing of this petition, the children had not been in ... Michael['s] ... residence with their mother for the last six months and there is no indication that the mother, April ... had sufficient information to know, or should have known, that these two children had any in [sic] appropriate sexual knowledge or were sexually abused by anyone.

Therefore, the lower court found, and April argues, that she could not have failed to protect her children because they were never in her care after she became aware of the sexual abuse allegations against her boy-friend. We find this argument to be without merit.

■ The present case has not developed to the point of necessitating a determination of the appropriateness of terminating the mother's parental rights; however, we find guidance from the applicable case law regarding a parent's nonparticipation in alleged abuse and the effect on termination of rights. This Court, in Syllabus point 5 of *West Virginia Department of Health and Human Resources ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996), stated as follows:

"Termination of parental rights of a parent of an abused child is authorized under *W. Va.Code*, 49–6–1 to 49–6–10, as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under *W. Va.Code*, 49–6–1 to 49–6–10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence." Syl. Pt. 2, *In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991).

Moreover, we have counseled that

"[i]mplicit in the definition of an abused child under West Virginia Code § 49–1–3 (1995) is the child whose health or welfare is harmed or threatened by a parent or guardian who fails to cooperate in identifying the perpetrator of abuse, rather choosing to remain silent." Syllabus Point 1, *W. Va. Dept. of Health & Human Resources v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996).

Syl. pt. 2, *In re Harley C.*, 203 W.Va. 594, 509 S.E.2d 875 (1998). In the *Harley C.* case, this Court recognized that the applicable statute defining an abused child to include one whose parent "knowingly" allows another person to commit abuse does not require that a parent actually be present at the time the abuse occurs, but, rather, that

the parent was presented with sufficient facts from which he or she could have and should have recognized that abuse has occurred.

While the facts as presented at the time of the filing of the petition are paramount, this Court has recognized that evidence of a parent's progress, or lack thereof, during the pre-adjudication improvement period in making a determination of whether the subject child is an abused and/or neglected child is a proper consideration when it relates back to conditions that existed at the time of the filing of the abuse and/or neglect petition, and that were alleged in such petition. *See generally State v. Julie G.*, 201 W.Va. 764, 500 S.E.2d 877 (1997). Significantly, termination of parental rights requires a specific and independent finding of fact or conclusion of law that the child was abused or that the child would be at risk of being abused if returned to that parent's custody. *See generally In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692.

In the present case, the mother was told by the aunt, the grandmother, and two mental health professionals of the children's disclosures of sexual abuse. While the timing of such disclosures to the mother is in question, Ms. Kennedy was quite clear in her testimony that April knew of the allegations, by her own admission, prior to the filing of the abuse and neglect petition.[17] Yet, April continued to live with the alleged perpetrator and believed him when he said he did not abuse the children. Her failure to acknowledge the facts, even when confronted by mental health experts and their opinions that the children had been sexually abused, shows her inability to protect the children from such behavior. In fact, the mother fashioned stories to try to explain away the inappropriate sexual information known by her children, even to the extent of lying about whether her son possessed any cars the size of matchbox cars.[18] The interview by Chanin Kennedy showed April to be at high risk of returning to a relationship with Michael.[19] Even in the face of serious allegations by her children, which were supported by all of the experts in the case, April disregarded the possibility that the allegations were true and has failed to take any actions to extricate herself from a man who had abused her children. Significantly, she remains with this man, and they have a newborn child together.[20] Because April clearly knew of the sexual abuse allegations prior to the filing of the abuse and neglect petition and because she has failed to take any steps, even to the present, to absent herself from a man whom all experts agree committed acts of sexual

17. Ms. Kennedy's testimony was that April admitted that she knew about the disclosures of the children that her boyfriend had told the children to get naked with him. Further, April stated to Ms. Kennedy that she knew it was an ongoing concern of Charlotte and Janet's prior to the time of the filing of the abuse and neglect petition. Disclosures by the children regarding Michael playing on his "pee bug" and the squirting of "milk;" however, were not realized by April until the serving of the abuse and neglect petition.

18. The mother testified that her son did not own any cars of such size. However, her boyfriend's adult son, who also lived in the home, testified to the presence of cases of cars that are of the same size as Matchbox cars.

19. During her testimony, Ms. Kennedy addressed the situation as follows:

Q. Okay. Given the history of the children disclosing first to grandma, to the aunt, the process with Peggy Tordella, the process with you, do you have concerns in regards to April['s] ... failing to protect these children?

A. Yes.
Q. Could you explain that?
A. I think that—and April and I discussed this directly. There's a lot of information to suggest these kids have been exposed to sexual behavior. They're reporting sexual contact with Mike, her boyfriend. I told her that there's never a case where someone can walk up to her and say 100 percent I know this happened. I witnessed it. It's there. But you have to weigh the risk to your children and listen to what your children are saying.

The fact that she has not taken further steps to protect the kids, that she has become pregnant with this man during this process, has not separated from him despite the ongoing information provided to her about that, raises the level of risk that she won't be able to protect them in the future.

20. We also recognize that, during oral arguments before this Court, the DHHR represented that it has continued to extend counseling services to the mother and to Katelyn and Joel, but that the mother has refused all offered services because she does not believe that any abuse has occurred.

abuse against her children, it was error for the circuit court to dismiss the petition against her.

## IV.

## CONCLUSION

For the foregoing reasons, the February 25, 2009, order by the Circuit Court of Harrison County is reversed to the extent that it failed to find clear and convincing evidence that sexual abuse of the minor children had occurred. Accordingly, this case is remanded to the circuit court for entry of an order adjudicating Katelyn and Joel as abused children based upon the sexual abuse perpetrated upon them by the boyfriend, Michael, and based upon the failure of the mother, April, to acknowledge that such abuse had occurred and her failure to take any actions to protect the children. This case is remanded to the circuit court for further proceedings consistent with this opinion.[21]

The mandate of this Court shall issue contemporaneously herewith.

Reversed and Remanded.

---

21. Recognizing the amount of time between the lower court's order and the finalization of the appeal process before this Court, we remind the parties that the remand proceedings should be disposed of forthwith. "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. pt. 1, in part, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). Further evidencing the priority placed on cases involving abused and neglected children, this Court has also stated that "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible." Syl. pt. 5, in part, *id.* Prompt resolution in such cases attempts to protect children from the turmoil associated with the lack of stability in their surroundings and in their caretakers. *See* Syl. pt. 3, in part, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians.").